## FOURTEEN DIAMOND RINGS, EMIL J. PEPKE, CLAIMANT v. UNITED STATES.

### ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.

No. 153. Argued December 17, 18, 19 and 20, 1900.—Decided December 2, 1901.

1. The ruling in *De Lima* v. *Bidwell*, 182 U. S. 1, reaffirmed and applied.
2. No distinction, so far as the question determined in that case is concerned, can be made between the Philippines and the Island of Porto Rico, after the ratification of the treaty of peace between the United States and Spain, April 11, 1899, and certainly not

(a) Because of the passage by the Senate alone, by a majority, but not two thirds of a *quorum*, of a joint resolution in respect to the intention of the Senate in the ratification;

(b) Or, because of the armed resistance of the native inhabitants, or of uncivilized tribes, in the Philippines, to the dominion of the United States;

(c) Or, because one of the justices who concurred in the judgment in *De Lima* v. *Bidwell*, also concurred in the judgment in *Downes* v. *Bidwell*, 182 U. S. 244.

The statement of the case will be found in the opinion of the court. The case was argued December 17, 18, 19 and 20, 1900. *Goetze, Appellant,* v. *United States* was heard at the same time. Leave was granted in this case to *Mr. Alexander Porter Morse* to file a brief on behalf of interested parties.

*Mr. Everit Brown* and *Mr. Edward C. Perkins* for appellant.

*Mr. Lawrence Harmon* for plaintiff in error.

*Mr. Charles H. Aldrich* for plaintiff in error.

*Mr. Attorney General* for the United States.

MR. CHIEF JUSTICE FULLER delivered the opinion of the court.

Emil J. Pepke, a citizen of the United States and of the State of North Dakota, enlisted in the First Regiment of the North Dakota United States Volunteer Infantry, and was assigned for duty with his regiment in the island of Luzon, in the Philippine Islands, and continued in the military service of the United States until the regiment was ordered to return, and, on arriving at San Francisco, was discharged September 25, 1899.

He brought with him from Luzon fourteen diamond rings, which he had there purchased, or acquired through a loan, subsequent to the ratification of the treaty of peace between the United States and Spain, February 6, 1899, and the proclamation thereof by the President of the United States, April 11, 1899.

In May, 1900, in Chicago, these rings were seized by a customs officer as having been imported contrary to law, without entry, or declaration, or payment of duties, and an information was filed to enforce the forfeiture thereof.

To this Pepke filed a plea setting up the facts, and claiming that the rings were not subject to customs duties; the plea was held insufficient; forfeiture and sale were decreed; and this writ of error was prosecuted.

The tariff act of July 24, 1897, 30 Stat. 151, in regulation of commerce with foreign nations, levied duties " upon all articles imported from foreign countries."

Were these rings, acquired by this soldier after the ratification of the treaty was proclaimed, when brought by him from Luzon to California, on his return with his regiment to be discharged, imported from a foreign country?

This question has already been answered in the negative, in respect of Porto Rico, in *De Lima* v. *Bidwell*, 182 U. S. 1, and unless the cases can be distinguished, which we are of opinion they cannot be in this particular, that decision is controlling.

The Philippines, like Porto Rico, became, by virtue of the treaty, ceded conquered territory or territory ceded by way of indemnity. The territory ceased to be situated, as Castine was when occupied by the British forces in the war of 1812, or as Tampico was when occupied by the troops of the United States during the Mexican war, " cases of temporary possession of territory by lawful and regular governments at war with the country of which the territory so possessed was part." *Thorington* v. *Smith*, 8 Wall. 10. The Philippines were not simply occupied but acquired, and having been granted and delivered to the United States, by their former master, were no longer under the sovereignty of any foreign nation.

In *Cross* v. *Harrison*, 16 How. 164, the question was whether goods imported from a foreign country into California after the cession were subject to our tariff laws, and this court held that they were.

In *De Lima* v. *Bidwell* the question was whether goods imported into New York from Porto Rico, after the cession, were subject to duties imposed by the act of 1897 on " articles imported from foreign countries," and this court held that they were not. That act regulated commerce with foreign nations, and Porto Rico had ceased to be within that category; nor could territory be foreign and domestic at the same time.

Among other things it was there said: " The theory that a country remains foreign with respect to the tariff laws until Congress has acted by embracing it within the customs union, presupposes that a country may be domestic for one purpose and foreign for another. It may undoubtedly become necessary for the adequate administration of a domestic territory to pass a special act providing the proper machinery and officers, as the President would have no authority, except under the war power, to administer it himself; but no act is necessary to make it domestic territory if once it has been ceded to the United States. . . . This theory also presupposes that territory may be held indefinitely by the United States; that it may be treated in every particular, except for tariff purposes, as domestic territory; that laws may be enacted and enforced by officers of the United States sent there for that purpose; that insurrec-

tions may be suppressed, wars carried on, revenues collected, taxes imposed; in short, that everything may be done which a government can do within its own boundaries, and yet that the territory may still remain a foreign country. That this state of things may continue for years, for a century even, but that until Congress enacts otherwise, it still remains a foreign country. To hold that this can be done as matter of law we deem to be pure judicial legislation. We find no warrant for it in the Constitution or in the powers conferred upon this court. It is true the nonaction of Congress may occasion a temporary inconvenience; but it does not follow that courts of justice are authorized to remedy it by inverting the ordinary meaning of words."

No reason is perceived for any different ruling as to the Philippines. By the third article of the treaty Spain ceded to the United States " the archipelago known as the Philippine Islands," and the United States agreed to pay to Spain the sum of twenty million dollars within three months. The treaty was ratified; Congress appropriated the money; the ratification was proclaimed. The treaty-making power; the executive power; the legislative power, concurred in the completion of the transaction.

The Philippines thereby ceased, in the language of the treaty, "to be Spanish." Ceasing to be Spanish, they ceased to be foreign country. They came under the complete and absolute sovereignty and dominion of the United States, and so became territory of the United States over which civil government could be established. The result was the same although there was no stipulation that the native inhabitants should be incorporated into the body politic, and none securing to them the right to choose their nationality. Their allegiance became due to the United States and they became entitled to its protection.

But it is said that the case of the Philippines is to be distinguished from that of Porto Rico because on February 14, 1899, after the ratification of the treaty, the Senate resolved, as given in the margin,* that it was not intended to incorporate the

---

* " *Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That by the ratification of the treaty of peace with Spain.it is not intended to incorporate the inhabitants

inhabitants of the Philippines into citizenship of the United States, nor to permanently annex those islands.

We need not consider the force and effect of a resolution of this sort, if adopted by Congress, not like that of April 20, 1898, in respect of Cuba, preliminary to the declaration of war, but after title had passed by ratified cession. It is enough that this was a joint resolution; that it was adopted by the Senate by a vote of 26 to 22, not two thirds of a quorum : and that it is absolutely without legal significance on the question before us. The meaning of the treaty cannot be controlled by subsequent explanations of some of those who may have voted to ratify it. What view the House might have taken as to the intention of the Senate in ratifying the treaty we are not informed, nor is it material; and if any implication from the action referred to could properly be indulged, it would seem to be that two thirds of a quorum of the Senate did not consent to the ratification on the grounds indicated.

It is further contended that a distinction exists in that while complete possession of Porto Rico was taken by the United States, this was not so as to the Philippines, because of the armed resistance of the native inhabitants to a greater or less extent.

We must decline to assume that the government wishes thus to disparage the title of the United States, or to place itself in the position of waging a war of conquest.

The sovereignty of Spain over the Philippines and possession under claim of title had existed for a long series of years prior to the war with the United States. The fact that there were insurrections against her or that uncivilized tribes may have defied her will did not affect the validity of her title. She granted the islands to the United States, and the grantee in accepting them took nothing less than the whole grant.

of the Philippine Islands into citizenship of the United States, nor is it intended to permanently annex said islands as an integral part of the territory of the United States; but it is the intention of the United States to establish on said islands a government suitable to the wants and conditions of the inhabitants of said islands to prepare them for local self-government, and in due time to make such disposition of said islands as will best promote the interests of the United States and the inhabitants of said islands." Cong. Rec. 55th Cong. 3d Sess. vol. 32, p. 1847.

If those in insurrection against Spain continued in insurrection against the United States, the legal title and possession of the latter remained unaffected.

We do not understand that it is claimed that in carrying on the pending hostilities the government is seeking to subjugate the people of a foreign country, but, on the contrary, that it is preserving order and suppressing insurrection in territory of the United States. It follows that the possession of the United States is adequate possession under legal title, and this cannot be asserted for one purpose and denied for another. We dismiss the suggested distinction as untenable.

But it is sought to detract from the weight of the ruling in *De Lima* v. *Bidwell* because one of the five justices concurring in the judgment in that case concurred in the judgment in *Downes* v. *Bidwell*, 182 U. S. 244.

In *De Lima* v. *Bidwell*, Porto Rico was held not to be a foreign country after the cession, and that a prior act exclusively applicable to foreign countries became inapplicable.

In *Downes* v. *Bidwell*, the conclusion of a majority of the court was that an act of Congress levying duties on goods imported from Porto Rico into New York, not in conformity with the provisions of the Constitution in respect to the imposition of duties, imposts and excises, was valid. Four of the members of the court dissented from and five concurred, though not on the same grounds, in this conclusion. The justice who delivered the opinion in *De Lima's* case was one of the majority, and was of opinion that although by the cession Porto Rico ceased to be a foreign country, and became a territory of the United States and domestic, yet that it was merely "appurtenant" territory, and "not a part of the United States within the revenue clauses of the Constitution."

This view placed the territory, though not foreign, outside of the restrictions applicable to interstate commerce, and treated the power of Congress, when affirmatively exercised over a territory, situated as supposed, as uncontrolled by the provisions of the Constitution in respect of national taxation. The distinction was drawn between a special act in respect of the particular country, and a general and prior act only applicable to

countries foreign to ours in every sense. The latter was obliged to conform to the rule of uniformity, which was wholly disregarded in the former.

The ruling in the case of *De Lima* remained unaffected, and controls that under consideration. And this is so notwithstanding four members of the majority in the *De Lima* case were of opinion that Porto Rico did not become by the cession subjected to the exercise of governmental power in the levy of duties unrestricted by constitutional limitations.

*Decree reversed and cause remanded with directions to quash the information.*

MR. JUSTICE BROWN, concurring:

I concur in the conclusion of the court in this case, and in the reasons given therefor in the opinion of the Chief Justice.

The case is distinguishable from *De Lima* v. *Bidwell*, 182 U. S. 1, in but one particular, viz., the Senate resolution of February 6, 1899. With regard to this, I would say that in my view the case would not be essentially different if this resolution had been adopted by a unanimous vote of the Senate. To be efficacious such resolution must be considered either (1) as an amendment to the treaty, or (2) as a legislative act qualifying or modifying the treaty. It is neither.

It cannot be regarded as part of the treaty, since it received neither the approval of the President nor the consent of the other contracting power. A treaty in its legal sense is defined by Bouvier as "a compact made between two or more independent nations with a view to the public welfare," (2 Law Dic. 1136,) and by Webster as " an agreement, league or contract between two or more nations or sovereigns, formally signed by commissioners properly authorized, and solemnly ratified by the sovereigns or the supreme power of each state." In its essence it is a contract. It differs from an ordinary contract only in being an agreement between independent states instead of private parties. *Foster* v *Neilson*, 2 Pet. 253, 314; *Head Money Cases*, 112 U. S. 580. By the Constitution, (art. 2, sec. 2,) the President " shall have power, by and with the ad-

vice and consent of the Senate, to make treaties, provided two thirds of the Senators present concur." Obviously the treaty must contain the whole contract between the parties, and the power of the Senate is limited to a ratification of such terms as have already been agreed upon between the President, acting for the United States, and the commissioners of the other contracting power. The Senate has no right to ratify the treaty and introduce new terms into it, which shall be obligatory upon the other power, although it may refuse its ratification, or make such ratification conditional upon the adoption of amendments to the treaty. If, for instance, the treaty with Spain had contained a provision instating the inhabitants of the Philippines as citizens of the United States, the Senate might have refused to ratify it until this provision was stricken out. But it could not, in my opinion, ratify the treaty and then adopt a resolution declaring it not to be its intention to admit the inhabitants of the Philippine Islands to the privileges of citizenship of the United States. Such resolution would be inoperative as an amendment to the treaty, since it had not received the assent of the President or the Spanish commissioners.

Allusion was made to this question in the *New York Indians* v. *United States,* 170 U. S. 1, 21, wherein it appeared that, when a treaty with certain Indian tribes was laid before the Senate for ratification, several articles were stricken out, several others amended, a new article added, and a proviso adopted that the treaty should have no force or effect whatever, until the amendment had been submitted to the tribes, and they had given their free and voluntary assent thereto. This resolution, however, was not found in the original or in the published copy of the treaty, or in the proclamation of the President, which contained the treaty without the amendments. With reference to this the court observed: " The power to make treaties is vested by the Constitution in the President and the Senate, and, while this proviso was adopted by the Senate, there was no evidence that it ever received the sanction or approval of the President. It cannot be considered as a legislative act, since the power to legislate is vested in the President, Senate and House of Representatives. There is something, too, which shocks the con-

science in the idea that a treaty can be put forth as embodying the terms of an arrangement with a foreign power or an Indian tribe, a material provision of which is unknown to one of the contracting parties, and is kept in the background to be used by the other only when the exigencies of a particular case may demand it. The proviso appears never to have been called to the attention of the tribes, who would naturally assume that the treaty embodied in the Presidential proclamation contained all the terms of the arrangement."

In short, it seems to me entirely clear that this resolution cannot be considered a part of the treaty.

I think it equally clear that it cannot be treated as a legislative act, though it may be conceded that under the decisions of this court Congress has the power to disregard or modify a treaty with a foreign state. This was not done.

The resolution in question was introduced as a *joint* resolution, but it never received the assent of the House of Representatives or the signature of the President. While a joint resolution, when approved by the President, or, being disapproved, is passed by two thirds of each house, has the effect of a law, (Const. art. 1, sec. 7,) no such effect can be given to a resolution of either house acting independently of the other. Indeed, the above clause expressly requires concurrent action upon a resolution " before the same shall take effect."

This question was considered by Mr. Attorney General Cushing in his opinion on certain Resolutions of Congress, 6 Ops. Attys. Gen. 680, in which he held that while joint resolutions of Congress are not distinguishable from bills, and have the effect of law, separate resolutions of either house of Congress, except in matters appertaining to their own parliamentary rights, have no legal effect to constrain the action of the President or Heads of Departments. The whole subject is there elaborately discussed.

In any view taken of this resolution it appears to me that it can be considered only as expressing the individual views of the Senators voting upon it.

I have no doubt the treaty might have provided, as did the act of Congress annexing Hawaii, that the existing customs re-

lations between the Spanish possessions ceded by the treaty and the United States should remain unchanged until legislation had been had upon the subject; but in the absence of such provision the case is clearly controlled by that of *De Lima* v. *Bidwell.*

MR. JUSTICE GRAY, MR. JUSTICE SHIRAS, MR. JUSTICE WHITE and MR. JUSTICE McKENNA dissented, for the reasons stated in their opinions in *De Lima* v. *Bidwell*, 182 U. S. 1, 200–220, in *Dooley* v. *United States*, 182 U. S. 222, 236–243, and in *Downes* v. *Bidwell*, 182 U. S. 244, 287–347.