## LOS ANGELES SOAP CO. v. ROGAN.
### No. 855.

District Court, S. D. California,
Central Division.
March 16, 1936.

· Isidore B. Dockweiler, Thomas A. Dockweiler, and Frank Mergenthaler, all of Los Angeles, Cal., for plaintiff.

Peirson M. Hall, U. S. Atty., and Clyde Thomas, Asst. U. S. Atty., both of Los Angeles, Cal., for defendant.

Daniel O'Brien, of Los Angeles, Cal., amicus curiæ.

YANKWICH, District Judge.

Section 602½ of the Revenue Act of 1934 (26 U.S.C.A. § 999) levies a processing tax of 3 cents per pound on certain oils, including coconut oil, sesame oil, palm oil, palm kernel oil, and sunflower oil. It also levies an additional tax of 2 cents per pound on coconut oil. This tax, however, does not apply to coconut oil produced in the Philippine Islands.

The plaintiff by its bill of complaint attacks the processing tax of 3 cents and seeks a determination both under the equity powers of the court and under the declaratory judgment statute (28 U.S.C.A. § 400) that it is an unconstitutional exaction and penalty and not a tax. Injunctive relief is sought against its collection.

The complaint discloses the following facts: The plaintiff is a manufacturer of soaps, operating a manufacturing plant in the city of Los Angeles, where the process of manufacturing is carried on wholly in intrastate commerce. It has a large establishment representing a large investment, and for thirty-seven years prior to the year 1935, its business was conducted at a substantial profit. In 1934, the bill states, it was able to make a profit merely because it had on hand large quantities of vegetable oil which had been purchased before the enactment of section 602½ of the Revenue Act of 1934. In the conduct of its business, which is exclusively that of the manufacture of soaps and allied products, plaintiff must use large quantities of coconut oil, which is the only important commercial source of lauric acid. It uses a

large quantity of coconut oil originating in the Philippine Islands. Its business is that of a processor within the meaning of the Revenue Act of 1934. Between May 1, 1934, and December 31, 1935, it paid under the act a total of $485,642.56 as processing tax on the processing of Philippine Islands oil. Processing taxes will continue to be levied by the defendant, who is the collector of internal revenue for the district, unless he is enjoined from collecting the tax. A temporary restraining order was issued. A temporary injunction is now sought. The defendant has filed objections to its issuance. He has also filed a motion to dismiss the bill upon the ground that it does not state facts sufficient to constitute a cause of action, that the court is without jurisdiction to restrain the collection of the tax or to entertain an action in declaratory relief relating to it, and that the plaintiff has a plain, speedy, and adequate remedy at law.

Plaintiff's attack upon the constitutionality of the statute is grounded upon the contention that it is not a tax under article 1, § 8, cl. 1, of the Constitution of the United States, but a penalty, the effect of which is to penalize the plaintiff for the benefit of certain producers of domestic oils and of the Philippine Islands.

The plaintiff, by paraphrasing certain general language of the Supreme Court in United States v. Butler (1936) 56 S.Ct. 312, 80 L.Ed. ——, insists that this tax is subject to the same constitutional frailty as the Agricultural Adjustment Act (see 7 U.S.C.A. § 601 et seq.).

It is well to bear in mind that the real basis for the decision in that case is the fact that the Congress had attempted to regulate agriculture and to achieve that result by means of moneys obtained through a tax. Whatever language of general character may have been used in the majority opinion must be read in the light of this main principle which lay at the foundation of the decision. The decision establishes the principle that, irrespective of any question of interstate commerce, the Congress of the United States has the power to levy a processing tax. The minority opinion, written by Mr. Justice Stone, emphasizes this fact by stating: "The constitutional power of Congress to levy an excise tax upon the processing of agricultural products is not questioned." See United States v. Butler (1936) 56 S. Ct. 312, 325, 80 L.Ed. ——.

Another significant matter to be borne in mind is the fact that the court adopted the Hamiltonian view on the meaning of the phrase "general welfare" contained in the taxing clause of the Constitution. Hamilton's view was contained in his Report on Manufactures, made by him in 1791, while he was Secretary of the Treasury. He there wrote: "The phrase is as comprehensive as any that could have been used, because it was not fit that the constitutional authority of the Union to appropriate its revenues should have been restricted within narrower limits than the 'general welfare,' and because this necessarily embraces a vast variety of particulars which are susceptible neither of specification nor of definition. It is, therefore, of necessity left to the discretion of the National Legislature to pronounce upon the objects which concern the general welfare and for which, under that description, an appropriation of money is requisite and proper. *And there seems to be no room for doubt that whatever concerns the general interests of learning, of agriculture, of manufacture, and of commerce, are within the sphere of the national councils, as far as regards application of money.*" (Italics added.)

The processing tax on coconut oil appears to be a revenue measure. It is not tied, as was the processing tax under the Agricultural Adjustment Act (see 7 U.S. C.A. § 601 et seq.), to any scheme, voluntary or coercive, to control intrastate activities which are beyond the power of the Congress. A reading of the measure and a comparison with other provisions would indicate that the object of the Congress may have been to make the tax replace the custom duty which applies to coconut oil originating elsewhere than in the Philippines. 19 U.S.C.A. § 1001, par. 54; 19 U.S.C.A. § 1301. Coconut oil so originating must pay in addition to this duty the processing tax of 3 cents per pound. The net result is that the processor who uses coconut oil not originating in the Philippine Islands is subject to a tax of 7 cents per pound, while those who, like the plaintiff, use oil originating in the Philippine Islands, pay only the 3 cents per pound processing tax. In effect, a protective tariff is thus given to this Philippine product. There is no direct discrimination between persons using one product instead of another. But, even if there were, that in itself would not render the tax invalid.

Courts have held repeatedly that a tax cannot be invalidated merely because its effect might be to discourage the use of a product, such as oleomargarine, or even the destruction of a business. See Veazie Bank v. Fenno (1869) 8 Wall. 533, 19 L. Ed. 482; McCray v. United States (1904) 195 U.S. 27, 56, 24 S.Ct. 769, 49 L.Ed. 78, 1 Ann.Cas. 561; Alaska Fish Co. v. Smith (1921) 255 U.S. 44, 41 S.Ct. 219, 220, 65 L.Ed. 489; Miller v. Standard Nut Margarine Co. (1932) 284 U.S. 498, 52 S. Ct. 260, 76 L.Ed. 422; Magnano Co. v. Hamilton (1934) 292 U.S. 40, 54 S.Ct. 599, 78 L.Ed. 1109; Fox v. Standard Oil Co. (1935) 294 U.S. 87, 100, 55 S.Ct. 333, 79 L.Ed. 780. In Alaska Fish Co. v. Smith, supra, Mr. Justice Holmes, said: "Even if the tax should destroy a business, it would not be made invalid or require compensation upon that ground alone. Those who enter upon a business take that risk."

■ Plaintiff quotes from certain of the debates which occurred during the discussion of the adoption of the coconut oil processing tax from which it may be inferred that the object of the Congress was to discourage the use of coconut oil and to force the use of domestic oil substitutes. Assuming this to have been the object, the answer is in the decisions just cited, which state clearly that, where the power to tax is not limited, the mere fact that the legislative body in exercising it may have sought to repress the use of one product or to foster the use of another does not make the exercise of the taxing power constitutionally vulnerable. See Fox v. Standard Oil Co., supra. Few tax measures could stand the test if the courts, disregarding the presumption of constitutionality, were to scrutinize apparently proper exercises of power with the view of discovering a hidden purpose to achieve an unlawful end. The instances in which courts have done so, such as Hill v. Wallace (1922) 259 U.S. 44, 42 S.Ct. 453, 66 L.Ed. 822; Bailey v. Drexel Furniture Co. (1922) 259 U.S. 20, 42 S.Ct. 449, 66 L.Ed. 817, 21 A.L.R. 1432; United States v. Constantine (1935) 296 U.S. 287, 56 S.Ct. 223, 80 L.Ed. ——; United States v. Butler, supra, were those in which the unlawful regulation sought to be attained, under the guise of taxation, was apparent to the court. They were instances in which the taxing power was used merely as a cloak to achieve an unauthorized end.

The contention here that the real aim was to aid indirectly domestic products and that for that reason the tax is, in reality, a penalty, is of the same character as that made in Miller v. Standard Nut Margarine Co., supra. There it was argued that the tax on oleomargarine was in reality a penalty imposed for the purpose of eliminating competition with butter. The Supreme Court declined to invalidate the tax upon that ground.

■ But it is insisted that, in view of the requirement of clause (A) of section 999 (a), title 26, that the taxes collected with respect to coconut oil wholly of Philippine product or produced from materials wholly of Philippine growth be held as a separate fund and be paid to the treasurer of the Philippine Islands, the object of the tax has failed with the establishment of the Philippine commonwealth. The date of the establishment of the Philippine commonwealth was subsequent to the enactment of the act. By the treaty concluded with Spain on November 7, 1900 (31 Stat. 1942), the Philippines "came under the complete and absolute sovereignty and dominion of the United States and so became territory of the United States over which civil government could be established." See Fourteen Diamond Rings v. United States (1901) 183 U.S. 176, 22 S. Ct. 59, 46 L.Ed. 138; Porto Rico Brokerage Co. v. United States (1935 Cust.& Pat. App.) 76 F.(2d) 605, 610.

There is no limitation upon the power of the Congress to appropriate money to use in any portion of its territories, whether the territories are states, possessions, or protectorates. See Balzac v. Porto Rico (1922) 258 U.S. 298, 42 S.Ct. 343, 66 L. Ed. 627. The power to govern possessions implies the power to spend money for their benefit. The power to govern implies the power to tax. And it cannot be contended that a tax from a particular source may not be earmarked for the use of a particular territory of the United States. The establishment of the Philippine commonwealth in 1935 under the independence statute of 1933, as amended (48 U.S.C.A. §§ 1231–1256), has not severed completely the ties between the Philippines and the United States. Until the complete withdrawal of the sovereignty of the United States over the Philippines, which will not occur until the expiration of a period of ten years from the date of the inauguration of the

new Philippine government, the United States retains certain rights of possession, supervision, jurisdiction, control, and sovereignty over the territory and people of the Philippines. This is evidenced by the reservations contained in the independence statute. The character of the Constitution is prescribed. Pending the final and complete withdrawal of the sovereignty of the United States, all citizens of the Philippine Islands owe allegiance to the United States. Every officer of the government of the commonwealth upon entering the discharge of his duties must take and subscribe an oath of office declaring, among other things, that he recognizes and accepts the supreme authority of the United States and will maintain true faith and allegiance to it. Certain fundamental rights are made mandatory in the new Constitution. The decisions of the courts of the commonwealth are subject to review by the Supreme Court of the United States. The United States may, by presidential proclamation, exercise the right to intervene for the maintenance or preservation of the government of the commonwealth of the Philippines or for the protection of life, property, and individual liberty and for the discharge of government obligations under and in accordance with the provisions of the Constitution. Pending complete withdrawal, the trade relations between the United States and the Philippines are to be governed by existing law. Certain levies on imports are established. The United States government exercises, in other ways, supervisory powers. Every amendment to the Constitution of the commonwealth of the Philippines must be submitted to the President of the United States for approval. The President of the United States has the authority to suspend the taking effect of or the operation of any law, contract, or executive order of the government of the Philippines when, in his judgment, it will result in disabling the government of the commonwealth to fulfill its contracts or to meet its bonded indebtedness or is likely to impair the reserves established for the protection of the currency of the Philippines or which in his judgment will violate the national obligations of the United States. He has a representative in the Philippine Islands in the person of the United States High Commissioner, who holds office at his pleasure. Restrictions are placed upon immigration. And, *what* *is most important,* in view of the discussion to follow on the tests of sovereignty, *the foreign affairs of the Islands are under the direct supervision and control of the United States.* In many fields, therefore, the will of the United States is still the law of the Philippine Islands.

To that extent the United States is still sovereign. For, as stated by Mr. Justice Holmes in American Banana Co. v. United Fruit Co. (1909) 213 U.S. 347, 358, 29 S.Ct. 511, 513, 53 L.Ed. 826, 16 Ann.Cas. 1047: "The very meaning of sovereignty is that the decree of the sovereign makes law."

Moore says: "A state is sovereign from the point of view of the law of nations, when it is independent of every other state in the exercise of its international rights externally and in the manner in which it lives and governs itself internally." John Bassett Moore, Digest of International Law (1906) vol. 1, p. 18. And see Wilson on International Law (2d Ed.1927) p. 16; De Lima v. Bidwell (1901) 182 U.S. 1, 21 S.Ct. 743, 45 L.Ed. 1041; Downes v. Bidwell (1901) 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088.

A state may exercise certain limited extraterritorial rights over its citizens or on certain subjects within the domain of another state, as in the case of the extraterritorial courts maintained by the United States in China and the mixed courts of certain European powers in Egypt. The exercise of these rights do not affect sovereignty. But, when one state demands allegiance of the citizens of another state and an oath of allegiance of its officials, retains appellate jurisdiction over its courts, gives its chief executive officer the right to suspend the operation of any law or governmental order by mere executive fiat and the right to veto amendments to the state's Constitution, retains the right to intervene (by force of arms, we assume) in order to maintain the government or to make it fulfill its obligations or for the purpose of protecting life and liberty, we have a quasi independence only.

We do not have either that internal or external independence of one state towards another which is the essence of sovereignty and which would justify an executive or judicial characterization of the territory of the subject state as foreign territory. De Lima v. Bidwell, supra; Downes v. Bidwell, supra.

Rather do we have that state of dependence which is designated in international relations as a protectorate. See The Ionian Ships (1855) 2 Spinks, 212; Scott's Cases on International Law (1922) p. 21; Rex v. The Earl of Crewe (1910) L. R. K. B. 576, 619, 620; The Charkieh, LR., 4 Adm.& Ecc. 59 (1873) Scott's Cases on International Law (1922) p. 22. One writer, a former associate justice of the Supreme Court of the Philippine Islands, has expressed the view that the status of the Philippine Islands under the Independence Act during the ten-year interim period might be designated as (what some authorities on international law call) "a kind or degree of semi-sovereignty." F. C. Fischer, "The Status of the Philippine Islands under the Independence Act," 19 American Bar Association Journal, 464 (August, 1933).

But, in the last analysis, it is unimportant what term we apply to the suzerainty which the United States still exercises over the Philippines.

On the whole, it is apparent that, by the establishment of the Philippine commonwealth, the Philippines have not ceased to be a possession of the United States. The government of the United States exercises powers over them which are those of a sovereign. It will not surrender its complete sovereignty until the 4th of July immediately following the expiration of a period of ten years from the inauguration of the new Philippine government. The United States having, therefore, retained certain sovereignty, although limited, over the Philippines, and having assumed certain binding obligations towards them, they may continue to pay to them moneys which have been collected for their benefit during the time when the United States exercised complete sovereignty over them.

■ But even if we assume that complete independence has already been achieved, and that the moneys which have accumulated from the processing tax on coconut oil originating in the Philippines, can no longer be paid to the Philippine Islands, the only result we can conceive would be that the moneys will go, as do other moneys derived from the processing tax established by the Revenue Act of 1934 (48 Stat. 683), into the Treasury of the United States and become a part of the general funds of the United States.

No authority has been called to our attention which holds that under such circumstances courts can relieve the taxpayer of its payment. We know of no legal doctrine sanctioning such result. Clearly it is for the Congress to say, assuming the original object to have failed, what shall be done with the money collected for the use of the Philippine Islands. It alone can determine that the money accumulated shall now be put to a different use or be returned to the taxpayer or that the taxpayer be, in the future, relieved of the tax.

We conclude that the processing tax on coconut oil is a proper exercise of the taxing power of the Congress of the United States and that the present status of the Philippines does not render invalid its exercise so as to relieve the processors of its payment. For a contrary view, see the findings in Iowa Soap Co. v. Huston (D.C. Iowa 1936) 13 F.Supp. 517.

■ We are also of the view that the complaint fails to state a cause for the intervention of this court, in view of the provisions of section 3224 of Revised Statutes (26 U.S.C.A. § 154 [now 26 U.S.C.A. § 1543]) and of the Declaratory Judgment Act, as amended (28 U.S.C.A. § 400) which prohibit the institution of suits seeking to enjoin the collection of taxes and of actions seeking declaratory judgments in tax matters. In Rieder v. Rogan (D.C.1935) 12 F.Supp. 307, I discussed very fully the validity of these provisions. The decision of the Supreme Court in the Rickert Rice Mills v. Fontenot (1936) 56 S.Ct. 374, 80 L.Ed. 355, does not weaken the authority of the long list of cases cited in my opinion and in which the Supreme Court has sustained consistently the validity of restraints upon the power to sue the government in tax matters. All that the court ruled in Rickert Rice Mills v. Fontenot, supra, was that, the Agricultural Adjustment Act (7 U.S.C.A. § 601 et seq.) having been declared unconstitutional, the uncollected taxes which had been impounded by the District Court pending the determination of the validity of the act were returnable to the taxpayer. This upon the ground that any attempt to collect them now would be an unlawful trespass. So ruling, the court did not either directly or indirectly, question the validity or propriety of congressional limitations upon suits relating to taxation. Two recent cases have so interpreted this decision. See Simonin's Sons, Inc., v. Rothensies (D.C.Pa.) 13 F.Supp. 807, decided in De-

cember, 1935, by Kirkpatrick, District Judge; Mellon v. Mertz, 82 F.(2d) 872, decided on February 24, 1936, by the Court of Appeals of the District of Columbia, and reported in full in Prentice-Hall 1936 Tax Service at paragraph 817. Restrictions upon the right to institute actions relating to a tax do not apply to penalties. See Lipke v. Lederer (1922) 259 U.S. 557, 42 S.Ct. 549, 66 L.Ed. 1061; Regal Drug Corporation v. Wardell (1922) 260 U.S. 386, 43 S.Ct. 152, 67 L.Ed. 318; United States v. Glidden Co. (1935 C.C.A.6) 78 F.(2d) 639; Graham v. Du Pont (1923) 262 U.S. 234, 43 S.Ct. 567, 67 L.Ed. 965; Coletti v. Cassidy (1935 D.C.Wyo.) 12 F. Supp. 21. But, as already stated, the statute under attack is not a penalty. Nor have the defendants brought themselves within the exception declared in Dodge v. Brady (1916) 240 U.S. 122, 36 S.Ct. 277, 60 L.Ed. 560, Bailey v. George (1922) 259 U.S. 16, 42 S.Ct. 419, 66 L.Ed. 816, and Miller v. Standard Nut Margarine Co., supra, which allows the court to take jurisdiction despite the statutory prohibition if extraordinary and exceptional circumstances exist. Of course mere illegality or unconstitutionality is not sufficient. See Cruickshank v. Bidwell (1900) 176 U.S. 73, 20 S.Ct. 280, 44 L.Ed. 377; Dodge v. Osborn (1916) 240 U.S. 118, 36 S.Ct. 275, 60 L.Ed. 557; Child Labor Tax Case (1922) 259 U.S. 20, 42 S.Ct. 449, 66 L. Ed. 817, 21 A.L.R. 1432; Fisher Flouring Mills Co. v. Vierhus (1935 C.C.A.9) 78 F.(2d) 889. At best, the bill of complaint merely shows that Philippine coconut oil is an essential ingredient to the business of the plaintiff; that the tax is onerous and might result in the depletion of the assets and property of the plaintiff; that the remedy for recovery through administrative channels is dilatory; that, if payment is refused, distress warrants might be levied, and, if suit for recovery were instituted, a multiplicity of suits would result. It has been held repeatedly that no question of multiplicity arises when one action by the taxpayer would determine the entire question. See Boise Artesian Water Co. v. Boise City (1909) 213 U.S. 276, 29 S.Ct. 426, 53 L.Ed. 796; Matthews v. Rodgers (1932) 284 U.S. 521, 52 S.Ct. 217, 76 L.Ed. 447, and note to same on "Multiplicity as Ground for Injunction against Alleged Unconstitutional Tax," 76 L.Ed. pages 455, 456; Moor v. Texas & N. O.

R. Co. (1935 C.C.A.5) 75 F.(2d) 386, 389; Rieder v. Rogan, supra. Nor is the trespass incidental to the collection of the tax considered an extraordinary circumstance. See Shelton v. Platt (1891) 139 U.S. 591, 11 S.Ct. 646, 35 L.Ed. 273; Dalton Adding Machine Co. v. Virginia (1915) 236 U.S. 699, 35 S.Ct. 480, 59 L.Ed. 797. The fact that the money collected might be paid over to the Philippine government is not a ground for the intervention of equity. Should this happen and should the law ultimately be declared unconstitutional, a situation would arise. as in the case of the failure of the Congress to appropriate money out of which refunds of taxes should be paid. And it has been held that such failure does not make the remedy provided through administrative channels inadequate. See Cohen v. Durning (1935 D.C.N.Y.) 11 F.Supp. 824, 825, 828; Frye & Co. v. Vierhus (D.C.1935) 12 F.Supp. 597; Fisher Flouring Mills v. Vierhus, supra. We add that the Declaratory Judgment Act (28 U.S.C.A. § 400), while remedial in nature, cannot be, even in the absence of the amendment of August 30, 1935, which excludes from its provisions controversies relating to tax matters, so interpreted as, to allow us to entertain suits for injunction in tax matters under circumstances under which they were not entertained before; for, as stated by the Supreme Court, in United States v. West Virginia (1935) 295 U.S. 463, 55 S.Ct. 789, 793, 79 L.Ed. 1546: "It [the Declaratory Judgment Act] does not purport to alter the character of the controversies which are the subject of the judicial power under the Constitution." And as more recently stated by the Circuit Court of Appeals of this circuit, in Southern Pacific Co. v. McAdoo, 82 F.(2d) 121, decided March 9, 1936: "The mere fact that a declaratory judgment is sought is not, of itself, a ground of Federal jurisdiction."

We conclude that the validity of the enactment under attack and the prohibitions which the Congress has placed upon the right to institute actions relating to taxation stand in the way of granting the relief sought by the bill, and that this court is without jurisdiction to entertain it. The temporary restraining order will therefore be vacated, a preliminary injunction will be denied, and the bill will be dismissed. An exception to each of the rulings made is allowed.