**M/V NONSUCO, Inc., Petitioner,**
v.
**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**S/S SAN VINCENTE, Inc., Petitioner,**
v.
**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**Nos. 7110, 7111.**

United States Court of Appeals Fourth Circuit.

Argued April 10, 1956.

Decided June 5, 1956.

Henry Cassorte Smith, New York City (Thomas Witter Chrystie, Samuel L. Brookfield and Carolinda Waters, New York City, on the brief), for petitioners.

David O. Walter, Atty., Department of Justice, Washington, D. C. (H. Brian Holland, Asst. Atty. Gen., Robert N. Anderson and I. Henry Kutz, Attys., Department of Justice, Washington, D. C., on the brief), for respondent.

Before PARKER, Chief Judge, DOBIE, Circuit Judge, and PAUL, District Judge.

PARKER, Chief Judge.

These are petitions to review a decision of the Tax Court holding that earnings of Philippine flag vessels prior to July 4, 1946 were not entitled to exemption from United States income taxation on the same basis as the earnings of other foreign flag vessels under section 231 (d)(1) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 231(d)(1).

Petitioners, hereafter referred to as taxpayers, are corporations organized under the laws of the Commonwealth of the Philippines in 1939 and 1940. Each taxpayer owned and operated one ship which was documented under the laws and flew the flag of the Philippines and was operated in international trade. It was agreed below that taxpayers were resident foreign corporations during the years involved and were taxable under the provisions of sections 231(b) and (c) and section 119(e) of the Internal Revenue Code of 1939 as amended, 26 U.S.C.A. §§ 119(e), 231(b, c). Taxpayers contended that under section 231(d) (1) of the Internal Revenue Code of 1939 they were entitled to the exemption of the earnings of the vessels from the time of the approval of the Philippine Act, approved June 10, 1941, granting a reciprocal exemption to vessels of the United States, to October 21, 1946. The Commissioner denied that they were entitled to the exemption on two grounds: (1) that the Philippine statute did not grant a reciprocal exemption in that it excepted income derived from Philippine coastwise trade, and (2) that the Philippines were not a "foreign country" within the meaning of section 231(d) (1).

The Tax Court held that the Philippine statute did grant a reciprocal exemption, notwithstanding the exception of income derived from coastwise trade, because section 231(d) (1) must be read in connection with the Merchant Marine Act of 1920, 46 U.S.C.A. § 883, which forbade transportation of merchandise in the coastwise trade of the United States otherwise than in a vessel built in and documented under the laws of the United States. This holding was manifestly correct and the Commissioner does not rely upon the point here. With respect to this matter the Tax Court said:

"Respondent argues that we should examine only the tax laws of the two governments, and urges that maritime provisions are not material to the construction of the Internal Revenue Code. We disagree. It has long been the rule that provisions, such as section 231(d) (1), which are enacted to give relief from double taxation and to facilitate foreign operations of American companies are to be interpreted in order to give effect to their general purpose as intended by Congress. Cf. Burnet v. Chicago Portrait Co., 1932, 285 U.S. 1, 52 S.Ct. 275, 76 L.Ed. 587. In the instant case, the maritime laws of the United States are material to the consideration of the practical result intended by the Congress which first enacted the exemption provision. In order to deal with the practical problems of taxation in a practical way, we must determine what shipping operations were effectively exempted from taxation by section 231(d) (1) before we can determine whether or not other laws

have the effect of granting an exemption which is equivalent thereto.

"In the case before us, we conclude that the substance of section 231(d) (1) effectively exempts only international shipping operations because of the existing prohibition in the Merchant Marine Act, supra, against coastwise shipping by other than vessels under United States registry. Since the Philippine law likewise exempts earnings arising out of international shipping operations, we hold that the exemptions are equivalent."

█ The Tax Court sustained the Commissioner's position, however, that the Philippines were not a foreign country within the meaning of section 231(d) (1) prior to the independence of the islands on July 4, 1946, and allowed exemption of the earnings of the vessels only for the period subsequent to that date. In this we think that the Tax Court failed to follow the realistic approach to the problem which it had followed on the question of the equivalence of the exemptions and that it gave an interpretation to section 231(d) (1) justified neither by the language nor the spirit of that section when it is considered, as it must be, in connection with other legislation and the evident purpose which Congress had in mind in its passage. That section is as follows:

"§ 231. *Tax on foreign corporations* * * *

"(d) *Exclusions.* The following items shall not be included in gross income of a foreign corporation and shall be exempt from taxation under this chapter:

"(1) *Ships under foreign flag.* Earnings derived from the operation of a ship or ships documented under the laws of a foreign country which grants an equivalent exemption to citizens of the United States and to corporations organized in the United States."

The question is not whether the Philippines, at all times and for all purposes, were to be deemed a country foreign to the United States prior to their independence on July 4, 1946, Proclamation No. 2695, U.S.Code Cong.Service 1946, p. 1731,[1] but whether vessels flying the flag of the Philippines and documented under their laws should be deemed to be documented under the laws of a foreign country[2] within the meaning of the exclusion above quoted from the section 231(d) of the Internal Revenue Code of 1939. In this connection it should be noted that at the time of the adoption of the Code the Philippines and the United States had long had separate tax laws, subject to the control of their respective legislatures, separately administered by their respective governmental agencies, with revenues accruing to their respective governments. Robinette v. Commissioner, 6 Cir., 139 F.2d 285. Since 1920, Philippine ships have been registered and

1. Cf. Cincinnati Soap Co. v. United States, 301 U.S. 308, 57 S.Ct. 764, 81 L.Ed. 1122; Fourteen Diamond Rings v. United States, 183 U.S. 176, 22 S.Ct. 59, 46 L. Ed. 138; Downes v. Bidwell, 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088; De Lima v. Bidwell, 182 U.S. 1, 21 S.Ct. 743, 45 L.Ed. 1041.

2. As said by Chief Justice Hughes in Burnet v. Chicago Portrait Co., 285 U.S. 1, 5–6, 52 S.Ct. 275, 277, 76 L.Ed. 587: "The word 'country,' in the expression 'foreign country,' is ambiguous. It may be taken to mean foreign territory or a foreign government. In the sense of territory, it may embrace all the territory subject to a foreign sovereign power. When referring more particularly to a foreign government, it may describe a foreign state in the international sense, that is, one that has the status of an international person with the rights and responsibilities under international law of a member of the family of nations; or it may mean a foreign government which has authority over a particular area or subject-matter, although not an international person but only a component part, or a political subdivision, of the larger international unit. The term 'foreign country' is not a technical or artificial one, and the sense in which it is used in a statute must be determined by reference to the purpose of the particular legislation." See also Delany v. Moraitis, 4 Cir., 136 F.2d 129, 131.

documented under the laws of the Philippines and not under the laws of the United States. They have flown the flag of the Philippines and have been treated as foreign vessels for all purposes. And the Philippines have been treated as foreign territory within the purview of our shipping laws. See 46 U.S.C. §§ 877, 883, 1222, 1241.

While the treatment accorded the Philippines both in the tax laws and shipping laws would indicate without more that Philippine vessels should be held to be embraced within the exclusion of the section under consideration, this becomes even clearer when it is remembered that following the Philippine Independence Act of March 24, 1934, c. 84, 48 Stat. 456, the Philippines adopted their own Constitution in 1935 and since then have functioned as an independent country except with respect to a few matters necessitated by the protectorate exercised by the United States pending complete independence. With respect to their status during this period, the Supreme Court, speaking through Chief Justice Stone, in Hooven & Allison Co. v. Evatt, 324 U.S. 652, 676–678, 65 S.Ct. 870, 882, 89 L.Ed. 1252, has said:

> "The new Philippine Constitution was adopted on February 8, 1935, and the new government under it was inaugurated on November 14, 1935. By the provisions of the Independence Act, the United States retained certain powers with respect to our trade relations with the Islands, with respect to their financial operations and currency, and the control of their foreign relations. The power of review by this Court of Philippine cases is continued and extended to all cases involving the Constitution of the Commonwealth of the Philippine Islands. § 7(6), 48 U.S.C.A. § 1237(6). Thus by the organization of the new Philippine government under the constitution of 1935, the Islands have been given, in many aspects, the status of an independent government, which has been reflected in its relations as such with the outside world.

> \* \* \* \* \* \*

> "The Independence Act, while it did not render the Philippines foreign territory, Cincinnati Soap Co. v. United States, supra, 301 U.S. 318–320, 57 S.Ct. 769, 770, 81 L.Ed. 1122, treats the Philippines as a foreign country for certain purposes. In 48 U.S.C. § 1238(a) (1), 48 U.S.C.A. § 1238(a) (1), it established immigration quotas for Filipinos coming to the United States, as if the Philippines were a separate country, and in that connection extended to Filipinos the immigration laws relating to the exclusion or expulsion of aliens. It also provided, 48 U.S.C. § 1238(a) (2), 48 U.S.C.A. § 1238(a) (2), that citizens of the Philippine Islands who are not citizens of the United States shall be considered as if they were aliens. For purposes of 8 U.S.C. §§ 154 and 156, 8 U.S.C.A. §§ 154, 156, relating to deportation, the Philippine Islands are declared to be a foreign country. 48 U.S.C. § 1238 (a) (4), 48 U.S.C.A. § 1238(a) (4). Foreign service officers of the United States may be assigned to the Philippines, and are to be considered as stationed in a foreign country. 48 U.S.C. § 1238a, 48 U.S.C.A. § 1238a. And the Independence Act, § 6, 48 Stat. 456, 460, provides that 'when used in this section in a geographical sense, the term "United States" includes all Territories and possessions of the United States, except the Philippine Islands, the Virgin Islands, American Samoa, and the island of Guam.' As we have said, the Philippines have frequently dealt with other countries, as a sovereignty distinct from the United States."

When we consider the purpose of the exclusion clause, we think it perfectly clear that Philippine vessels should be held to be embraced within its provisions.

The purpose of the clause (first enacted as 213(b) (8) of the Revenue Act of 1921, 42 Stat. 239) was "to encourage the international adoption of uniform tax laws affecting shipping companies, for the purpose of eliminating double taxation, * * *." S.Rep. 275, 67th Cong. 1st Sess. p. 14. A foreign country within the scope of this purpose would be one which exercised, as did the Philippines, the power of taxation over the earnings of ships engaged in commerce. Congress was not dealing with such questions as were presented in the Insular cases, but with the exercise of the power of taxation by those who were exercising that power and was attempting to eliminate the evil of double taxation by holding out the proffer of a reciprocal exemption. As was said by Chief Justice Hughes in Burnet v. Chicago Portrait Co., 285 U.S. 1, 7–10, 52 S.Ct. 275, 277, 76 L.Ed. 587, which dealt with credit for income taxes paid to a foreign country:

"In the instant case, the question is one of credit for income taxes 'paid to any foreign country.' The word 'country' is manifestly used in the sense of government. And to decide what government fits the description, whether only that of a foreign power which may be considered an international person, or that of a political entity which, although not an international person, levies and collects income taxes which may be the subject of the intended credit, it is necessary to consider the object of the enactment and to construe the expression 'foreign country' so as to achieve, and not defeat, its aim. We think that the purpose of the statute is clear. The fact that the provision is for a credit to the domestic corporation, against income taxes payable here, of income taxes 'paid during the same taxable year to any foreign country,' itself demonstrates that the primary design of the provision was to mitigate the evil of double taxation. * * *

"In effectuating these purposes, it is manifest that the controlling consideration was the fact that the income tax was paid to a foreign government competent to lay the tax, and not the international status of that government. The burden upon the domestic corporation was the same whether the foreign government had international standing or was a lesser political entity which nevertheless had authority to impose the exaction upon the corporation or its subsidiary. And if credit was to be allowed here by reason of the payment of the income tax abroad, it made no difference to the Government of the United States whether the payment abroad was made to the one sort of foreign government or the other. The reasons underlying the allowance of the credit were applicable in either case."

There was just as much reason to extend the offer of a reciprocal exemption to the Philippines as to any other country exercising the power to tax shipping and, in truth, a stronger reason; for we were exercising a benevolent guardianship over the development of the Philippines and were doing everything within our power to foster the development of their trade and commerce. As said by Mr. Justice Murphy (who had served as Governor General and as United States High Commissioner of the Philippines) in his concurring opinion in Hooven & Allison Co. v. Evatt, supra, 324 U.S. at pages 692–693, 65 S.Ct. at page 889:

"We have as a nation exhibited an ideal and a selfless concern for the well-being of the Philippine people, a concern that has been deepened by the devestation that war has brought to their land. Since the Islands were ceded to us, we have at once fostered their economic development through preferential trade agreements and encouraged their desires for freedom and independence. Their industries and their agriculture have

gradually been adjusted in contemplation of their eventual sovereign independence. But war has stricken their land and their peoples. Their growing economy has been largely decimated by over three years of ruthless invasion and occupation. Filipinos in countless numbers have yielded up not only their property but their lives and their liberties. Their economic and social structure has fallen about them in ruins.

"Now, with the Islands liberated, our moral and legal obligations are greater than ever before. Our responsibility for providing urgent relief and rehabilitation has been readily assumed. But the more complex and difficult duty of helping to reconstruct the Philippine economic structure remains to be fulfilled. It is clear that the Philippines cannot safely be thrown into the world market and left to shift for themselves. For the foreseeable future, at least, their economy must be closely linked to that of the United States, without either country abandoning or retreating from the common ideal of independence for the Philippines.

"Accordingly it is my view that if it is reasonably possible to do so we should avoid a construction of the term 'imports,' as used in Article I, section 10, clause 2 of the Constitution, that would place Philippine products at a disadvantage on the American market to the advantage of products from other countries or that might be a means of impeding the economic rehabilitation of the Philippines."

The fact that Congress, in enacting the Revenue Act of 1921, made special provision in section 222(a), 42 Stat. 249, for the credit of taxes paid to a possession of the United States is no sufficient reason for not treating Philippine vessels as vessels documented under the laws of a foreign country, especially after the adoption of the Philippine Constitution of 1935 and the assumption of quasi-sovereign powers by the islands, with complete control of the taxing power as well as of shipping. No sensible reason has been advanced, and none suggests itself, as to why Congress should have intended a discrimination against the commerce of the Philippines as compared with the commerce of the Republic of Panama, for example, or any other country exercising the taxing power over commerce. Even if such an intention could be inferred at the time of the passage of the Act of 1921, when the Philippines were a mere possession, it could not reasonably be inferred after the islands had become in 1935 an independent country in practically all respects, subject only to a limited control for the purpose of its protection. The section here relied on was passed in 1939 and the intent of Congress should be judged as of that time. If, however, we go back to the act of 1921 to judge the purpose and intent of Congress, we think it clear that the shipping of a nation occupying the status that the Philippines occupied after 1935 must have been embraced within the language used. As said in De Lima v. Bidwell, 182 U.S. 1, at page 197, 21 S.Ct. 743, at page 753, 45 L.Ed. 1041: "While a statute is presumed to speak from the time of its enactment, it embraces all such persons or things as subsequently fall within its scope, and ceases to apply to such as thereafter fall without its scope."

For the reasons stated, the judgment appealed from will be reversed.

Reversed.