**Rosario Santillan VALMONTE,**
**Petitioner,**

v.

**IMMIGRATION AND**
**NATURALIZATION SERVICE,**
**Respondent.**

**Docket No. 96–4194.**

United States Court of Appeals,
Second Circuit.

Argued Aug. 29, 1997.

Decided Feb. 11, 1998.

Elly Velez Pamatong, Hollis, NY, for Petitioner.

Jonathan E. Demson, Assistant United States Attorney, Southern District of New York (Mary Jo White, United States Attorney, Steven M. Haber, Assistant United States Attorney, Southern District of New York, New York City, of counsel), for Respondent.

Before: MESKILL and JACOBS, Circuit Judges, and KORMAN, District Judge.*

MESKILL, Circuit Judge:

This is a petition for review of a decision of the Board of Immigration Appeals upholding an immigration judge's decision to deny petitioner's application for suspension of deportation and order petitioner deported to her native Philippine Islands (Philippines). The issue on appeal is whether petitioner's birth in the Philippines while that country was a United States territory confers on her United States citizenship under the Fourteenth Amendment. We conclude that it does not and we deny the petition.

## BACKGROUND

### I

Petitioner Rosario Santillan Valmonte was born in the Philippines on August 30, 1934. On February 16, 1989, she entered the United States under a visitor's visa which authorized her to remain in the United States until August 16, 1989. Petitioner remained in the United States beyond the expiration of her visitor's visa.

On April 28, 1993, the INS served on petitioner an order to show cause and notice

---

* Honorable Edward R. Korman, United States District Judge for the Eastern District of New York, sitting by designation.

of hearing, charging her with deportability under section 241(a)(1)(B) of the Immigration and Nationality Act of 1952 (the "INA"), 8 U.S.C. § 1251(a)(1)(B).[1] At her deportation hearing, petitioner admitted the factual allegations contained in the order to show cause and conceded deportability. She applied for suspension of deportation under former section 244(a)(1) of the INA, 8 U.S.C. § 1254(a)(1).[2] On April 3, 1995, the immigration judge denied petitioner's application for suspension of deportation and ordered her deported to the Philippines. In lieu of deportation, the immigration judge granted petitioner the option to depart voluntarily from the United States pursuant to section 244(e)(1) of the INA, 8 U.S.C. § 1254(e)(1), provided that she depart by April 1, 1996.

Petitioner appealed the immigration judge's decision to the Board of Immigration Appeals (BIA). The BIA dismissed the appeal on September 24, 1996, concluding that petitioner had not met the statutory criteria for suspension of deportation. The BIA granted petitioner the option to depart voluntarily from the United States within thirty days from the dismissal of the appeal.

On December 16, 1996, petitioner timely petitioned this Court pursuant to section 106(a) of the INA, 8 U.S.C. § 1105a(a), to deny enforcement of the BIA's decision.[3] Petitioner argues that under the Fourteenth Amendment she is a United States citizen by virtue of her birth in the Philippines in 1934, during the period when the Philippines were a United States territory. We disagree.

Petitioner's birth in the Philippines during its status as a United States territory does not confer on her United States citizenship under the Fourteenth Amendment. The petition is therefore denied. Before discussing the merits of petitioner's argument, we briefly chronicle the history of the Philippines' status as a United States territory.

II

The United States acquired the Philippines by treaty at the close of the Spanish–American War. Treaty of Peace between the United States of America and the Kingdom of Spain, Dec. 10, 1898, U.S.–Spain, 30 Stat. 1754 (hereinafter "Treaty of Paris"). The Treaty of Paris established that the "civil rights and political status of the native inhabitants of the [Philippines] ... [would] be determined by the Congress." Treaty of Paris, art. IX, 30 Stat. at 1759. The Treaty did not contain any provision incorporating the inhabitants of the Philippines as citizens of the United States.

In 1902, after a period of military rule in the Philippines, the United States Congress enacted the Philippine Government Act, establishing the terms of the United States' civilian rule of the Philippines. *See* Philippine Government Act, ch. 1369, 32 Stat. 691 (1902). The Philippine Government Act provided that all inhabitants of the Philippines as of April 11, 1899 (who had not elected to preserve their allegiance to Spain) would be "deemed and held to be citizens of the Philippine Islands and as such entitled to the protection of the United States." *Id.* § 4, 32 Stat. at 692; *see also* Philippine Autonomy Act, ch. 416, § 2, 39 Stat. 545, 546 (1916) (same). The Philippine Government Act did not make the inhabitants of the Philippines citizens of the United States but conferred on them a status popularly referred to as "nationals." *See* 4 Charles Gordon *et al.*, Immigration Law and Procedure § 91.01[3][b], at 91–5 (rev. ed. 1997) (The term "national"

---

**1.** Section 241 of the INA, 8 U.S.C. § 1251, was redesignated recently as section 237 of the INA, 8 U.S.C. § 1227. *See* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. No. 104–208, § 305(a)(2), 110 Stat. 3009–598 (IIRIRA).

**2.** Section 244 of the INA, 8 U.S.C. § 1254, was repealed recently by section 308(b)(7) of IIRIRA, *supra*, 110 Stat. 3009–615. The relief petitioner sought, "suspension of deportation," has been replaced by an analogous form of relief called "cancellation of removal." *See id.* § 304(a)(3),

110 Stat. 3009–594 (codified at section 240A of the INA, 8 U.S.C. § 1229b).

**3.** Section 106(a) of the INA, 8 U.S.C. § 1105a(a), was repealed recently. *See* IIRIRA, *supra*, § 306(b), 110 Stat. 3009–612. This repeal, however, applies only to final orders of deportation filed on or after September 30, 1996. Here the BIA issued its final order of deportation against petitioner on September 24, 1996, prior to the September 30 cutoff date. *See* INA, *supra*, § 101(a)(47)(B)(i), 8 U.S.C. § 1101(a)(47)(B)(i).

referred to non-citizen inhabitants of territories that the United States had acquired outside of its continental limits who nevertheless owed permanent allegiance to the United States and who were entitled to the United States' protection.). The status was a "convenient construct for those who favored territorial expansion but did not wish to make the people of the new territory citizens of the United States or otherwise suggest that they might aspire to equality under the American constitutional system." José A. Cabranes, Citizenship and the American Empire: Notes on the Legislative History of the United States Citizenship of Puerto Ricans 5, n. 12 (1979).[4] Notably, under the Philippine Government Act, the Philippines were specifically excluded from section 1891 of the Revised Statutes of 1878, which provided that "[t]he Constitution and all laws of the United States ... shall have the same force and effect within all the organized Territories, and in every Territory hereafter organized as elsewhere within the United States." Philippine Government Act § 1, 32 Stat. at 692; *see* Rev. Stat. of 1878, ch. 1, § 1891, 18 Stat. 325, 333 (1874).

The United States exercised complete sovereignty over the Philippines. *See Fourteen Diamond Rings v. United States*, 183 U.S. 176, 179, 22 S.Ct. 59, 60, 46 L.Ed. 138 (1901) (observing that the Philippines, following its cession by Spain, was under the "complete and absolute sovereignty and dominion of the United States"). By congressional action, the United States organized a tripartite system of government in the Philippines, over which the United States reserved ultimate control.[5] Congress established the office of the Governor General of the Philippine Islands who would be appointed by the United States President, with the advice and consent of the Senate. The Governor General exercised "supreme executive power" although his decisions were subject to the President's approval. Philippine Autonomy Act, *supra*, § 21, 39 Stat. at 552–53. The Philippine

Legislature was required to report the enactment of all laws to Congress, and Congress reserved the right to annul those laws. *Id.* § 19, 39 Stat. at 551. The President, with the advice and consent of the Senate, appointed the Justices of the Philippine Supreme Court, *id.* § 26, 39 Stat. at 555, and the Philippine Supreme Court's decisions, with minor exceptions, were subject to review by the United States Supreme Court, *id.* § 27, 39 Stat. at 555.

In 1934, thirty-five years after the United States acquired the Philippines from Spain, Congress adopted the Philippine Independence Act which provided for the adoption of a Philippine Constitution and the withdrawal of United States sovereignty ten years thereafter. Philippine Independence Act, ch. 84, § 10(a), 48 Stat. 456, 463 (1934) (codified as amended at 22 U.S.C. § 1394). Furthermore, citizens of the Philippines, formerly "nationals" of the United States, were to be treated as aliens under the United States' immigration laws. *Id.* § 8(a)(1), 48 Stat. at 462.

On July 4, 1946, the United States declared the Philippines to be an independent nation, terminating the Philippines' status as a United States territory. Proclamation No. 2695, 60 Stat. 1352, 11 Fed.Reg. 7517 (1946), *reprinted in* 22 U.S.C. § 1394. Upon this final and complete withdrawal of American sovereignty, "the immigration laws of the United States ... appl[ied] to persons who were born in the Philippine Islands to the same extent as in the case of other foreign countries." Philippine Independence Act, *supra*, § 14, 48 Stat. at 464.

## DISCUSSION

The principal issue in this petition is the territorial scope of the term "the United States" in the Citizenship Clause of the Fourteenth Amendment. U.S. Const. amend. XIV, § 1 ("All persons born or naturalized *in the United States*, and subject to

---

4. The term "national of the United States" is presently defined as one who is a citizen of the United States or "a person who, though not a citizen of the United States, owes permanent allegiance to the United States." INA, *supra*, § 101(a)(22), 8 U.S.C. § 1101(a)(22).

5. Philippine Government Act, ch. 1369, 32 Stat. 691 (1902); Philippine Autonomy Act, ch. 416, 39 Stat. 545 (1916); Philippine Independence Act, ch. 84, 48 Stat. 456 (1934).

the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." (emphasis added)). Petitioner, who was born in the Philippines in 1934 during its status as a United States territory, argues she was "born ... in the United States" and is therefore a United States citizen.[6]

■ Petitioner's argument is relatively novel, having been addressed previously only in the Ninth Circuit. *See Rabang v. INS,* 35 F.3d 1449, 1452 (9th Cir.1994) ("No court has addressed whether persons born in a United States territory are born 'in the United States,' within the meaning of the Fourteenth Amendment."), *cert. denied sub nom. Sanidad v. INS,* 515 U.S. 1130, 115 S.Ct. 2554, 132 L.Ed.2d 809 (1995). In a split decision, the Ninth Circuit held that "birth in the Philippines during the territorial period does not constitute birth 'in the United States' under the Citizenship Clause of the Fourteenth Amendment, and thus does not give rise to United States citizenship." *Rabang,* 35 F.3d at 1452. We agree.[7]

Despite the novelty of petitioner's argument, the Supreme Court in the *Insular Cases*[8] provides authoritative guidance on the territorial scope of the term "the United States" in the Fourteenth Amendment. The *Insular Cases* were a series of Supreme Court decisions that addressed challenges to duties on goods transported from Puerto Rico to the continental United States. Puerto Rico, like the Philippines, had been recently ceded to the United States. The Court considered the territorial scope of the term "the United States" in the Constitution and held that this term as used in the uniformity clause of the Constitution was territorially limited to the states of the Union. U.S. Const. art. I, § 8 ("[A]ll Duties, Imposts and Excises shall be uniform *throughout the United States.*" (emphasis added)); *see Downes v. Bidwell,* 182 U.S. 244, 251, 21 S.Ct. 770, 773, 45 L.Ed. 1088 (1901) ("[I]t can nowhere be inferred that the territories were considered a part of the United States. The Constitution was created by the people of the *United States,* as a union of *States,* to be governed solely by representatives of the *States;* ... In short, the Constitution deals with *States,* their people, and their representatives."); *Rabang,* 35 F.3d at 1452. Puerto Rico was merely a territory "appurtenant and belonging to the United States, but not a part of the United States within the revenue clauses of the Constitution." *Downes,* 182 U.S. at 287, 21 S.Ct. at 787.

■ The Court's conclusion in *Downes* was derived in part by analyzing the territorial scope of the Thirteenth and Fourteenth Amendments. The Thirteenth Amendment prohibits slavery and involuntary servitude "within the United States, *or* any place sub-

---

**6.** Although this argument was not raised before the immigration judge or on appeal to the BIA, it may be raised for the first time in this petition. *See* INA, *supra,* § 106(a)(5), 8 U.S.C. § 1105a(a)(5).

**7.** For the purpose of deciding this petition, we address only the territorial scope of the phrase "the United States" in the Citizenship Clause. We do not consider the distinct issue of whether citizenship is a "fundamental right" that extends by its own force to the inhabitants of the Philippines under the doctrine of territorial incorporation. *Dorr v. United States,* 195 U.S. 138, 146, 24 S.Ct. 808, 812, 49 L.Ed. 128 (1904) ("Doubtless Congress, in legislating for the Territories would be subject to those fundamental limitations in favor of personal rights which are formulated in the Constitution and its amendments." (citation and internal quotation marks omitted)); *Rabang,* 35 F.3d at 1453 n. 8 ("We note that the territorial scope of the phrase 'the United States' is a distinct inquiry from whether a constitutional provision should extend to a territory." (citing

*Downes v. Bidwell,* 182 U.S. 244, 249, 21 S.Ct. 770, 772, 45 L.Ed. 1088 (1901))). The phrase "the United States" is an express territorial limitation on the scope of the Citizenship Clause. Because we determine that the phrase "the United States" did not include the Philippines during its status as a United States territory, we need not determine the application of the Citizenship Clause to the Philippines under the doctrine of territorial incorporation. *Cf. United States v. Verdugo–Urquidez,* 494 U.S. 259, 291 n. 11, 110 S.Ct. 1056, 1074 n. 11, 108 L.Ed.2d 222 (1990) (Brennan, *J.,* dissenting) (arguing that the Fourth Amendment may be applied extraterritorially, in part, because it does not contain an "express territorial limitation[ ]").

**8.** *De Lima v. Bidwell,* 182 U.S. 1, 21 S.Ct. 743, 45 L.Ed. 1041 (1901); *Dooley v. United States,* 182 U.S. 222, 21 S.Ct. 762, 45 L.Ed. 1074 (1901); *Armstrong v. United States,* 182 U.S. 243, 21 S.Ct. 827, 45 L.Ed. 1086 (1901); and *Downes v. Bidwell,* 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088 (1901).

ject to their jurisdiction." U.S. Const. amend. XIII, § 1 (emphasis added). The Fourteenth Amendment states that persons "born or naturalized *in the United States, and* subject to the jurisdiction thereof, are citizens of the United States and of the *State* wherein they reside." U.S. Const. amend XIV, § 1 (emphasis added). The disjunctive "or" in the Thirteenth Amendment demonstrates that "there may be places within the jurisdiction of the United States that are no[t] part of the Union" to which the Thirteenth Amendment would apply. *Downes,* 182 U.S. at 251, 21 S.Ct. at 773. Citizenship under the Fourteenth Amendment, however, *"is not extended to persons born in any place 'subject to [the United States'] jurisdiction,'"* but is limited to persons born or naturalized in the states of the Union. *Downes,* 182 U.S. at 251, 21 S.Ct. at 773 (emphasis added); *see also id.* at 263, 21 S.Ct. at 777 ("[I]n dealing with foreign sovereignties, the term 'United States' has a broader meaning than when used in the Constitution, and includes all territories subject to the jurisdiction of the Federal government, wherever located.").[9]

Following the decisions in the *Insular Cases,* the Supreme Court confirmed that the Philippines, during its status as a United States territory, was not a part of the United States. *See Hooven & Allison Co. v. Evatt,* 324 U.S. 652, 678, 65 S.Ct. 870, 883, 89 L.Ed. 1252 (1945) ("As we have seen, [the Philippines] are not a part of the United States in the sense that they are subject to and enjoy the benefits or protection of the Constitution, as do the states which are united by and under it."); *see id.* at 673–74, 65 S.Ct. at 881 (Philippines "are territories belonging to, but not a part of, the Union of states under the Constitution," and therefore imports "brought from the Philippines into the United States ... are brought from territory, which is not a part of the United States, into the territory of the United States.").

Accordingly, the Supreme Court has observed, without deciding, that persons born

in the Philippines prior to its independence in 1946 are not citizens of the United States. *See Barber v. Gonzales,* 347 U.S. 637, 639 n. 1, 74 S.Ct. 822, 823 n. 1, 98 L.Ed. 1009 (1954) (stating that although the inhabitants of the Philippines during the territorial period were "nationals" of the United States, they were not "United States citizens"); *Rabang v. Boyd,* 353 U.S. 427, 432 n. 12, 77 S.Ct. 985, 988 n. 12, 1 L.Ed.2d 956 (1957) ("The inhabitants of the Islands acquired by the United States during the late war with Spain, *not being citizens of the United States,* do not possess right of free entry into the United States." (emphasis added) (citation and internal quotation marks omitted)).

Petitioner, notwithstanding this line of Supreme Court authority since the *Insular Cases,* argues that the Fourteenth Amendment codified English common law principles that birth within the territory or dominion of a sovereign confers citizenship. Because the United States exercised complete sovereignty over the Philippines during its territorial period, petitioner asserts that she is therefore a citizen by virtue of her birth within the territory and dominion of the United States. Petitioner argues that the term "the United States" in the Fourteenth Amendment should be interpreted to mean "within the dominion or territory of the United States." *Rabang,* 35 F.3d at 1459 (Pregerson, *J.,* dissenting); *see United States v. Wong Kim Ark,* 169 U.S. 649, 693, 18 S.Ct. 456, 473–74, 42 L.Ed. 890 (1898) (relying on the English common law and holding that the Fourteenth Amendment "affirms the ancient and fundamental rule of citizenship by birth *within the territory,* in the allegiance and under the protection of the country" (emphasis added)); *Inglis v. Sailors' Snug Harbour,* 28 U.S. (3 Pet.) 99, 155, 7 L.Ed. 617 (1830) (Story, *J.,* concurring and dissenting) (citizenship is conferred by "birth locally within the dominions of the sovereign; and ... birth within the protection and obedience ... of the sovereign").

9. Congress, under the Act of February 21, 1871, ch. 62, § 34, 16 Stat. 419, 426, expressly extended the Constitution and federal laws to the District of Columbia. *See Downes,* 182 U.S. at 261, 21 S.Ct. at 777 (stating that the "mere cession of

the District of Columbia" from portions of Virginia and Maryland did not "take [the District of Columbia] out of the United States or from under the aegis of the Constitution.").

We decline petitioner's invitation to construe *Wong Kim Ark* and *Inglis* so expansively. Neither case is reliable authority for the citizenship principle petitioner would have us adopt. The issue in *Wong Kim Ark* was whether a child born to alien parents in the United States was a citizen under the Fourteenth Amendment. That the child was born in San Francisco was undisputed and "it [was therefore] unnecessary to define 'territory' rigorously or decide whether 'territory' in its broader sense (i.e. outlying land subject to the jurisdiction of this country) meant 'in the United States' under the Citizenship Clause." *Rabang*, 35 F.3d at 1454.[10] Similarly, in *Inglis*, a pre-Fourteenth Amendment decision, the Court considered whether a person, born in the colonies prior to the Declaration of Independence, whose parents remained loyal to England and left the colonies after independence, was a United States citizen for the purpose of inheriting property in the United States. Because the person's birth within the colonies was undisputed, it was unnecessary in that case to consider the territorial scope of common law citizenship.

■ The question of the Fourteenth Amendment's territorial scope was not before the Court in *Wong Kim Ark* or *Inglis* and we will not construe the Court's statements in either case as establishing the citizenship principle that a person born in the outlying territories of the United States is a United States citizen under the Fourteenth Amendment. *See Rabang*, 35 F.3d at 1454. "[G]eneral expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision." *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399, 5 L.Ed. 257 (1821) (Marshall, *C.J.*).

In sum, persons born in the Philippines during its status as a United States territory were not "born ... in the United States" under the Fourteenth Amendment. *Rabang*, 35 F.3d at 1453 (Fourteenth Amendment has an "express territorial limitation which prevents its extension to every place over which the government exercises its sovereignty."). Petitioner is therefore not a United States citizen by virtue of her birth in the Philippines during its territorial period.

■ Petitioner makes several additional arguments that we address and dispose of quickly. First, contrary to petitioner's argument, Congress' classification of the inhabitants of the Philippines as "nationals" during the Philippines' territorial period did not violate the Thirteenth Amendment. The Thirteenth Amendment "proscribe[s] conditions of 'enforced compulsory service of one to another.'" *Jobson v. Henne*, 355 F.2d 129, 131 (2d Cir.1966) (quoting *Hodges v. United States*, 203 U.S. 1, 16, 27 S.Ct. 6, 8, 51 L.Ed. 65 (1906)).

■ Furthermore, contrary to petitioner's argument, Congress had the authority to classify her as a "national" and then reclassify her as an alien to whom the United States immigration laws would apply. Congress' authority to determine petitioner's political and immigration status was derived from three sources. Under the Constitution, Congress has authority to "make all needful Rules and Regulations respecting the Territory ... belonging to the United States," *see* U.S. Const. art. IV, § 3, cl. 2, and "[t]o establish an uniform Rule of Naturalization," *id.* art. I, § 8, cl.4. The Treaty of Paris provided that "the civil rights and political status of the native inhabitants ... shall be determined by Congress." Treaty of Paris, *supra*, art. IX, 30 Stat. at 1759. This authority was confirmed in *Downes* where the Supreme Court stated that the "power to acquire territory by treaty implies not only the power to govern such territory, but to prescribe upon what terms the United States

---

**10.** This point is well illustrated by the Court's ambiguous pronouncements on the territorial scope of common law citizenship. *See Rabang*, 35 F.3d at 1454; *compare Wong Kim Ark*, 169 U.S. at 658, 18 S.Ct. at 460 (under the English common law, "every child born *in England* of alien parents was a natural-born subject" (emphasis added)), *and id.* at 661, 18 S.Ct. at 462 ("Persons who are born *in a country* are generally deemed citizens and subjects of that country." (citation and internal quotation marks omitted; emphasis added)), *with id.* at 667, 18 S.Ct. at 464 (citizenship is conferred by "birth within the dominion").

will receive its inhabitants, and what their *status* shall be." *Downes,* 182 U.S. at 279, 21 S.Ct. at 784; *see Rabang v. Boyd,* 353 U.S. 427, 432, 77 S.Ct. 985, 988, 1 L.Ed.2d 956 (1957) (rejecting argument that Congress did not have authority to alter the immigration status of persons born in the Philippines).

Congress' reclassification of Philippine "nationals" to alien status under the Philippine Independence Act was not tantamount to a "collective denaturalization" as petitioner contends. *See Afroyim v. Rusk,* 387 U.S. 253, 257, 87 S.Ct. 1660, 1662, 18 L.Ed.2d 757 (1967) (holding that Congress has no authority to revoke United States citizenship). Philippine "nationals" of the United States were not naturalized United States citizens. *See Manlangit v. INS,* 488 F.2d 1073, 1074 (4th Cir.1973) (holding that *Afroyim* addressed the rights of a naturalized American citizen and therefore does not stand as a bar to Congress' authority to revoke the non-citizen, "national" status of the Philippine inhabitants).

## CONCLUSION

The territorial scope of the term "the United States" in the Citizenship Clause of the Fourteenth Amendment did not include the Philippines during its status as a United States territory. Accordingly, the petition for review is denied.