**Horace Gozon FRIEND,**
**Plaintiff–Appellee,**

**v.**

**Janet RENO, Attorney General; U.S. Department of Justice; Immigration and Naturalization Service, Defendants–Appellants.**

**Horace Gozon Friend, Plaintiff–Appellee,**

**v.**

**Janet Reno, Attorney General; U.S. Department of Justice; Immigration and Naturalization Service, Defendants–Appellants.**

Nos. 97–56251, 97–56328.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 4, 1999.

Decided March 29, 1999.

Janet M.C. Thomas and Tracie Pham, Law Office of Janet M.C. Thomas, Newport Beach, California, for the plaintiff-appellee-cross-appellant.

John B. Bartos, Assistant United States Attorney, Los Angeles, California, for the defendants-appellants-cross-appellees.

Before: BROWNING, HALL, and GRABER, Circuit Judges.

CYNTHIA HOLCOMB HALL, Circuit Judge:

The Attorney General appeals from the district court's declaratory judgment holding that Horace Gozon Friend is a citizen of the United States. The district court had jurisdiction over this matter pursuant to 8 U.S.C. § 1503(a). We have jurisdiction to review the decision of the district court pursuant to 28 U.S.C. § 1291, and we reverse.

I.

The facts of this case are not in dispute. Horace Gozon Friend ("Friend") was born in the Philippines on January 16, 1931, when the Philippines was a possession of the United States. His father, Horace B. Friend, was a U.S. citizen who had never left the Philippines before Friend's birth. Under a statute then in force, section 1993 of the U.S. Revised Statutes, Friend's father must have resided "in the United States" prior to his son's birth in order to

transmit his U.S. citizenship to his son. *See* Rev. Stat. § 1993; *Weedin v. Chin Bow,* 274 U.S. 657, 675, 47 S.Ct. 772, 71 L.Ed. 1284 (1927). Friend has contended before various U.S. authorities that his father's residence in the Philippines should qualify as residence "in the United States" within the meaning of section 1993.

The U.S. Embassy in the Philippines disagreed, informing Friend in 1983 that he did not qualify for derivative U.S. citizenship. On January 25, 1986, Friend arrived in the United States on a nonimmigrant visa and, despite the earlier decision from the U.S. Embassy, filed an application for a certificate of U.S. citizenship with the Immigration and Naturalization Service ("INS"). On July 23, 1991, an Immigration Examiner granted Friend a certificate of citizenship because his father had been a citizen of the United States and had "resided in the United States prior to [Friend's] . . . birth."

On January 29, 1992, approximately six months after Friend received his certificate, an INS official in Manila, the Philippines, requested a review of Friend's file. On February 24, 1992, the U.S. Embassy in Manila informed the INS that it believed that Friend's certificate of citizenship had been issued in error. Approximately twenty months later, on August 16, 1993, Friend was served with a notice of intent to cancel his certificate of citizenship because his father's residence in the Philippines did not constitute residence "in the United States" under Rev. Stat. § 1993. Friend's certificate of citizenship was revoked on November 22, 1994, and his administrative appeal was dismissed on June 4, 1996.

On September 19, 1996, Friend submitted a corrected complaint requesting a declaratory judgment from the U.S. District Court that Friend was a citizen of the United States and that the Attorney General had revoked his certificate of citizenship unlawfully. The district court ruled that, while a close question, Horace B. Friend's residence in the Philippines did not constitute residence "in the United States" for purposes of granting Friend derivative citizenship under Rev. Stat. § 1993. Despite this holding, the district court determined that the certificate was revoked improperly. The court reasoned that the status of the Philippines under § 1993 was sufficiently ambiguous that the Immigration Examiner's error in issuing the certificate of citizenship did not rise to a level of illegality sufficient to permit the certificate's cancellation under 8 U.S.C. § 1453. Moreover, the district court found that the cancellation of the certificate amounted to an abuse of the Attorney General's discretion. As a result, the district court granted summary judgment for Friend, declaring him to be a citizen of the United States. The court granted a stay, however, pending appeal to this Court.

Both the Attorney General and Friend challenge the district court's decision. On cross-appeal, Friend contends that the district court erred in holding that residence in the Philippines as of 1931 did not constitute residence "in the United States" under Rev. Stat. § 1993. Friend also asserts that even if section 1993's definition of the United States did not include the Philippines, any such distinction between the Philippines and other U.S. Territories that were considered part of the United States under section 1993 violates his equal protection rights under the Fifth and Fourteenth Amendments to the U.S. Constitution. On direct appeal, the Attorney General claims that the district court incorrectly ruled that the Immigration Examiner's mistake of law provided insufficient grounds to revoke Friend's certificate of citizenship under 8 U.S.C. § 1453. The Attorney General also argues that she committed no abuse of discretion in canceling Friend's certificate of citizenship.

## II.

The central dispute in this case is raised on cross-appeal: whether the residence of Friend's father in the Philippines qualified as residence "in the United

States" under Rev. Stat. § 1993, thereby permitting Friend's father to transmit his U.S. citizenship to Friend. We review questions of statutory interpretation and grants of summary judgment de novo. *See Margolis v. Ryan,* 140 F.3d 850, 852 (9th Cir.1998) (summary judgment); *Barrera–Echavarria v. Rison,* 44 F.3d 1441, 1444 (9th Cir.1995) (en banc) (statutory interpretation). If the statute is silent or ambiguous, and Congress has not expressed its intent on the issue in question, the court will defer to the agency's interpretation of the statute unless it is arbitrary or capricious. *See Jang v. Reno,* 113 F.3d 1074, 1076–77 (9th Cir.1997).

Despite its age, it is clear that Rev. Stat. § 1993 is the statute that controls the outcome of this case. *See United States v. Viramontes–Alvarado,* 149 F.3d 912, 915 (9th Cir.1998) (" 'The applicable law for transmitting citizenship to a child born abroad when one parent is a U.S. citizen is the statute that was in effect at the time of the child's birth.' ") (quoting *Ablang v. Reno,* 52 F.3d 801, 803 (9th Cir.1995)) (internal quotation omitted). The version of section 1993 in force at the time of plaintiff's birth in 1931 stated in relevant part:

> All children heretofore born or hereafter born out of the limits and jurisdiction of the United States, whose fathers were or may be at the time of their birth citizens thereof, are declared to be citizens of the United States; but the rights of citizenship shall not descend to children whose fathers never resided in the United States.

Rev. Stat. § 1993; *see also Rogers v. Bellei,* 401 U.S. 815, 823 n. 3, 91 S.Ct. 1060, 28 L.Ed.2d 499 (1971).

█ Friend claims that his father's residence in the Philippines should qualify as residence in the United States, permitting Friend's father to transfer his U.S. citizenship to Friend. The Attorney General opposes this interpretation, arguing that the

Philippines is not included in section 1993's reference to the United States. Section 1993 itself provides no clear definition of the term "United States," and no cases have expressly addressed this ambiguity.[1] This lack of a clear definition is not surprising given the fact that, at the time of section 1993's original enactment in 1855, the United States had yet to annex unincorporated territories such as the Philippines.

The only contemporary interpretation of section 1993 cited by either party is an opinion from the solicitor of the State Department, dated September 4, 1930, shortly before Friend's birth. *See* Citizenship, Does Residence in the Philippine Islands Satisfy the Requirement of Section 1993 of Revised Statutes of the United States Concerning Residence in the United States?, II Op. Solicitor's Off. 935 (Dep't State 1930). In that opinion, the solicitor considered the citizenship of a girl born in China whose father was a U.S. citizen. The father had not resided in any U.S. territory other than the Philippines prior to his daughter's birth. Based on these facts, the solicitor concluded that the father had not resided "in the United States" for the purposes of section 1993, and therefore could not transfer his U.S. citizenship to his daughter. *See id.* at 936–38. This opinion squarely supports the Attorney General's interpretation of section 1993.

In reaching its conclusion, the solicitor's opinion relied on interpretations of the term "United States" in the context of the Fourteenth Amendment to the U.S. Constitution. *See id.* at 938. The Fourteenth Amendment provides in relevant part that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const., amend. XIV, § 1. This Court has recently confirmed that "birth in the Philippines during the territorial peri-

---

1. One district court has noted that the claim that residence in the Philippines did not qualify as residence "in the United States" under

section 1993 "may be well founded." *In re Mendiola,* 647 F.Supp. 839, 841 & n. 1 (S.D.N.Y.1986).

od does not constitute birth 'in the United States' under the Citizenship Clause of the Fourteenth Amendment, and thus does not give rise to United States citizenship." *Rabang v. Immigration & Naturalization Serv.*, 35 F.3d 1449, 1452 (9th Cir.1994); *accord Lacap v. Immigration & Naturalization Serv.*, 138 F.3d 518, 519 (3d Cir. 1998) (per curiam); *Valmonte v. Immigration & Naturalization Serv.*, 136 F.3d 914, 921 (2d Cir.1998). The reasons supporting *Rabang*'s interpretation of the term "United States" in the Fourteenth Amendment apply with equal force in the context of section 1993.

The *Rabang* court based its reading of the Fourteenth Amendment in part on the *Insular Cases.*[2] The *Insular Cases* had stated, in the context of the Thirteenth Amendment, that "'there may be places within the jurisdiction of the United States that are no part of the Union.'" *Rabang*, 35 F.3d at 1453 (quoting *Downes v. Bidwell*, 182 U.S. 244, 251, 21 S.Ct. 770, 45 L.Ed. 1088 (1901)); *see also Dorr v. United States*, 195 U.S. 138, 143, 149, 24 S.Ct. 808, 49 L.Ed. 128 (1904) (stating that "the United States may have territory ... which is not incorporated into the United States as a body politic," and describing the Philippines as a "ceded territory ... not made a part of the United States"); *Valmonte*, 136 F.3d at 919 (noting that, even after "the *Insular Cases*, the Supreme Court confirmed that the Philippines, during its status as a United States territory, was not a part of the United States").

The *Rabang* court also detailed the special status that Congress accorded the Philippines throughout its history as a U.S. possession. The treaty by which Spain ceded the Philippines and Puerto Rico to the United States provided that the rights of the inhabitants of those lands would be set by the U.S. Congress, and established that these possessions would not be incorporated into the United States. *See* Treaty of Peace between the United States of America and the Kingdom of Spain, Dec. 10, 1898, U.S.-Spain, art. III, 30 Stat. 1754, 1755; *Rabang*, 35 F.3d at 1450; *see also Rassmussen v. United States*, 197 U.S. 516, 520, 25 S.Ct. 514, 49 L.Ed. 862 (1905), *rejected on other grounds, Williams v. Florida*, 399 U.S. 78, 92, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970). In 1902, the Philippine Government Act, ch. 1369, § 4, 32 Stat. 691, 692 (1902), established that all residents of the Philippines "shall be deemed and held to be citizens of the Philippine Islands." This act also stated that the Constitution and laws of the United States would not apply to the Philippines. *See id.* at § 1; *Dorr*, 195 U.S. at 143–44, 24 S.Ct. 808; *Rabang*, 35 F.3d at 1450 & n. 2. Congress expressed its desire that the Philippines continue on its path to greater self-governance in the Philippine Autonomy Act, ch. 416, 39 Stat. 545 (1916), and adopted the Philippine Independence Act, ch. 84, 48 Stat. 456 (1934), eighteen years later. *See Rabang*, 35 F.3d at 1450–51. On July 4, 1946, the Philippines gained its total independence pursuant to Proclamation No. 2695, 60 Stat. 1352, 11 Fed.Reg. 7517 (1946). *See Rabang*, 35 F.3d at 1451. This path to independence was in contrast to the history of Puerto Rico, whose inhabitants received U.S. citizenship under various statutes from 1917 forward. *See id.* at 1450 n. 1.

It therefore appears that, as in the Fourteenth Amendment context, the Philippines was not a part of the United States for the purposes of section 1993. To rebut this persuasive authority, Friend relies on the Nationality Act of 1940, ch. 876, 54 Stat. 1139, the underlying purpose of section 1993, and various administrative decisions that address issues of derivative citizenship.

---

**2.** *De Lima v. Bidwell*, 182 U.S. 1, 21 S.Ct. 743, 45 L.Ed. 1041 (1901); *Dooley v. United States*, 182 U.S. 222, 21 S.Ct. 762, 45 L.Ed. 1074 (1901); *Armstrong v. United States*, 182 U.S. 243, 21 S.Ct. 827, 45 L.Ed. 1086 (1901); *Downes v. Bidwell*, 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088 (1901).

The 1940 Act, which superseded Rev. Stat. § 1993, clarified the definition of the term "United States," indicating that, "when used in a geographical sense," the phrase referred to "the continental United States, Alaska, Hawaii, Puerto Rico, and the Virgin Islands of the United States." Nationality Act of 1940, § 101(d). All other U.S. territories, with the exception of the Canal Zone, were termed "outlying possessions." *Id.* at § 101(e). Section 201(e) of the 1940 Act replaced part of Rev. Stat. § 1993, and stated that a citizen of the United States could transfer his or her citizenship to a child born in an "outlying possession of the United States" if that parent had "resided in the United States or one of its outlying possessions prior to the birth of such person."

Thus, under the terms of the 1940 Act, Friend clearly would be a citizen of the United States because his father had resided in an outlying possession of the United States prior to Friend's birth. *See id.; see also In Status Determination Proceedings*, 4 I. & N. Dec. 575 (Dec. 11, 1951). The parties dispute, however, whether the 1940 Act represented a clarification or a modification of section 1993. Friend argues that the result under the 1940 Act is identical to that intended under section 1993. The Attorney General responds that the 1940 Act's definition of the United States demonstrates that the same term as used in section 1993 did not include the Philippines. According to the Attorney General, the 1940 Act actually revised and liberalized section 1993 by permitting parents who had resided exclusively in outlying U.S. possessions to transfer their U.S. citizenship to their children.

The 1940 Act itself provides no guidance on the subject, and the legislative history surrounding the 1940 Act's passage is far from conclusive. *See* To Revise & Codify the Nationality Laws of the United States into a Comprehensive Nationality Code: Hearings on H.R. 6127 Before the House of Representatives Comm. on Immigration & Naturalization, 76th Cong. (1940). An examination of the Congressional hearings discussing the Nationality Act of 1940 makes it clear that the 1940 Act was more than just a simple codification of prior immigration laws. *See, e.g., id.* at 31 (statement of Henry B. Hazard, Director of Research, Labor Department). Unfortunately, these same hearings do not indicate precisely whether the 1940 Act revised the provision of section 1993 before us today.[3] *See, e.g., id.* at 55–56, 59–60, 243. Thus, the Nationality Act of 1940, and the legislative history surrounding its passage, are of little assistance in interpreting section 1993.

Friend also contends that the Philippines was included in section 1993's refer-

---

**3.** To the extent that we are able to divine any guidance from the legislative history of the 1940 Act, it appears to favor the Attorney General's interpretation of section 1993. At least one member of the House of Representatives expressed displeasure at the fact that section 201(e) of the Nationality Act of 1940 would permit a parent who had never "seen the United States," i.e., who had only lived in a U.S. territory, to transmit the parent's U.S. citizenship to the parent's children. To Revise & Codify the Nationality Laws of the United States into a Comprehensive Nationality Code: Hearings on H.R. 6127 Before the House of Representatives Comm. on Immigration & Naturalization, 76th Cong. 40 (1940). This statement suggests that the 1940 Act represented a modification of existing law. This interpretation is only furthered by a later part of the legislative history detailing

changes in a separate part of the 1940 Act, wherein it is noted:

> [T]he Department of State has heretofore held that children born in the outlying possession of the United States whose fathers were citizens of the United States and had previously resided *in the continental United States or one of the incorporated territories thereof,* acquired citizenship of the United States at birth ... under the provision of section 1993 of the Revised Statutes.

Secretary of State et al., 76th Cong., 1st Sess., Nationality Laws of the United States 429 (Comm.Print.1938) (emphasis added).

The distinction that this passage implicitly draws between the incorporated and unincorporated territories of the United States supports a finding that section 201(e) of the 1940 Act represented a modification, and not a mere clarification, of Rev. Stat. § 1993.

ence to the United States because this result would be consistent with the purpose of that statute, which was to prevent U.S. citizens from transmitting their U.S. citizenship to children who never had been exposed to American values or otherwise acculturated to life in the United States. Friend argues that those who resided in the Philippines in 1931, when it was under the complete sovereignty of the United States, should be viewed as being sufficiently "American" to permit them to transmit their U.S. citizenship to their children.

We agree with Friend that section 1993 was intended to ensure that parents who transmitted their U.S. citizenship were sufficiently imbued with American values to convey these ideals to their children. *See Weedin*, 274 U.S. at 667, 47 S.Ct. 772 (noting that section 1993 could not be interpreted to extend "citizenship to a generation whose birth, minority and majority, whose education, and whose family life, have all been out of the United States and naturally within the ... environment of an alien country"). But this conclusion begs the question of whether in 1931, Congress, or anyone else for that matter, viewed the Philippines, an unincorporated territory, as being sufficiently "American" to properly inculcate its inhabitants with America's values.

The mere fact that the U.S. exercised sovereign powers over the Philippines does not answer the question. In *Weedin*, for example, the Supreme Court noted favorably State Department consular instructions which stated that a father's residence

in Jerusalem, where the United States exercised "extraterritorial powers" by treaty, did not satisfy section 1993's requirement that the father have resided "in the United States" before his child could receive U.S. citizenship. *See id.* at 674, 47 S.Ct. 772. While the Philippines certainly had a closer relationship with the United States than did Jerusalem, the mere fact that the United States exercised sovereign power over the Philippines does not mean that Congress viewed that territory as being sufficiently American to qualify as part of the United States under section 1993. Indeed the *Insular Cases* and *Rabang* suggest just the opposite.[4] *See Downes*, 182 U.S. at 341, 21 S.Ct. 770 (noting that the unincorporated territory of "Porto Rico ... was subject to the sovereignty of ... the United States," but that "it was foreign to the United States in a domestic sense") (White, J., with Shiras and McKenna, J.J., concurring in the judgment); *Rabang*, 35 F.3d at 1450–51.

Finally, Friend relies on administrative decisions to support his claim that his father's residence in the Philippines qualified him for U.S. citizenship under section 1993. In *Matter of F*, 1 I. & N. Dec. 287 (July 16, 1942), the Board of Immigration Appeals ("BIA") held that, for the purposes of section 1993, a father's residence in the unincorporated territory of Puerto Rico, from 1908 until 1922, qualified as residence in the United States, permitting him to transfer his U.S. citizenship to his children. *See id.* In reaching its conclusion, the BIA noted that a prior interpretation by the INS had held that residence

---

4. The administrative decision in *Matter of Y*, 7 I. & N. Dec. 667 (Mar. 3, 1958), does not add any support to Friend's argument. That decision specifically held that, under the Nationality Act of 1940, residence in the Philippines permitted a U.S. citizen to transmit his U.S. citizenship to his daughter. The decision reasoned that residence in one of the outlying possessions of the United States ensured that a parent could transmit American values to his child. *See id.* at 669. This decision merely confirms our prior interpretation of the 1940 Act, which would have permitted Friend

to be a U.S. citizen if it had been in force at the time of Friend's birth. *Matter of Y* does not state whether, prior to the passage of the 1940 Act, Congress viewed the Philippines as being sufficiently "American" to permit U.S. citizens to transmit their U.S. citizenship to their children. Indeed, parts of that decision imply that the state of the law in 1931 was more restrictive, requiring a parent to reside in the United States proper before the parent could transfer U.S. citizenship to a child. *See id.*

in an unincorporated territory would not permit a father to transfer his U.S. citizenship to his children under section 1993. Because this decision conflicted with interpretations of section 1993 by other departments, however, the INS revised its prior ruling, and stated that residence in Puerto Rico would qualify as residence "in the United States" under section 1993. *See id.* at 287–88. Friend argues that *Matter of F* demonstrates that residence in an unincorporated territory such as Puerto Rico or, for our purposes, the Philippines, qualifies as residence "in the United States" under section 1993.

But in reaching its conclusion, *Matter of F* relied on the fact that the father in that case had received U.S. citizenship under various acts of Congress which conferred citizenship to residents of Puerto Rico. *See id.* at 288. No similar statutes ever extended U.S. citizenship to residents of the Philippines.[5] Later administrative rulings clarified that unincorporated territories and possessions of the United States generally did not qualify as part of the United States under section 1993, but that the State Department had made a special exception for Puerto Rico. *See Matter of L.G.J. & C.I.P.*, 3 I. & N. Dec. 206, 208 n. 4 (Apr. 2, 1948). This distinction between Puerto Rico and the Philippines makes sense given the fact that the Philippines was headed toward independence, whereas Puerto Rico was not. *See Rabang*, 35 F.3d at 1450–51.

As a result, we agree with the district court that a parent's residence in the Philippines in 1931 did not permit that parent to transfer his U.S. citizenship to his children. This interpretation is mandated by the unique status of the Philippines during its territorial period and prior decisions of

this Court, and it is consistent with the legislative history of the 1940 Act, the underlying purposes of section 1993, and administrative decisions that have considered the issue. Our conclusion is only strengthened by the general rule that "[t]he reviewing court should ... give deference to an agency's interpretation of the statutes it administers." *Barrera–Echavarria*, 44 F.3d at 1444 (citing *Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)); *see also Jang*, 113 F.3d at 1077 (noting that the court's "review is especially deferential in the context of immigration policy").

### III.

Friend next argues that our interpretation of section 1993 violates the Equal Protection component of the Fifth Amendment because it impermissibly differentiates between the Philippines and other U.S. territories, such as Hawaii and Puerto Rico, which were considered part of the United States under section 1993. Friend claims that all U.S. territories were equally instilled with American values, and that, as a result, a parent's residence in any of them should have fulfilled the goals of section 1993.

We previously have stated that " '[j]udicial inquiry into immigration legislation is limited in deference to the long recognized power of the political branches ... to expel or exclude aliens.' " *Viramontes–Alvarado*, 149 F.3d at 916 (quoting *Ablang*, 52 F.3d at 804) (internal quotation omitted). As the court in *Viramontes–Alvarado* explained, "[i]n cases alleging constitutional infirmities in immigration laws, this court must determine if there is

---

**5.** This fact also differentiates the instant case from *Matter of L.G.J. & C.I.P.*, 3 I. & N. Dec. 206 (Apr. 2, 1948), wherein the BIA determined that a father's residence in Hawaii before it became an incorporated territory of the United States qualified as residence "in the United States" under section 1993. That decision turned on the provisions of the Act of

April 30, 1900, ch. 339, § 100, 31 Stat. 141, 161, which specifically stated that residence in Hawaii prior to the naturalization of its inhabitants under that act would be "deemed equivalent to residence in the United States." No similar provision ever applied to the Philippines.

a 'facially legitimate and bona fide reason' for enacting a discriminatory rule." *Id.* (quoting *Ablang,* 52 F.3d at 804). This inquiry is equivalent to the more traditional rational basis review used in many equal protection cases. *See Ablang,* 52 F.3d at 804. Importantly, " '[w]here a statute is assessed pursuant to a deferential standard of review, it is constitutionally irrelevant whether the justification proffered by the government was in fact the reasoning that generated the legislative classification.' " *Id.* at 805 (quoting *Wauchope v. United States Dep't of State,* 985 F.2d 1407, 1415 (9th Cir.1993)) (internal quotation omitted).

The fact that the Philippines was destined for independence, whereas Hawaii and Puerto Rico were not, provides a rational basis for the exclusion of the Philippines from the term "United States" in section 1993. The Congress established in 1902 that the Constitution and laws of the United States would not apply in the Philippines, and it reaffirmed Philippine autonomy again in 1916. *See Rabang,* 35 F.3d at 1450–51. With the Philippine Independence Act in 1934, the separate destiny of the Philippines became clear beyond any doubt. *See id.* at 1451.

Hawaii, in contrast, clearly was incorporated into the United States, and its inhabitants were made citizens of the United States at a very early date. *See* Act of April 30, 1900, ch. 339, § 100, 31 Stat. 141, 161; *Hawaii v. Mankichi,* 190 U.S. 197, 209–11, 23 S.Ct. 787, 47 L.Ed. 1016 (1903). Some inhabitants of Puerto Rico were accorded U.S. citizenship in 1917, evidencing the intent of Congress to forge a closer relationship with that territory than with the Philippines, whose separate citizenship status had been reaffirmed the prior year. *See* Organic Act of Puerto Rico, ch. 145, § 5, 39 Stat. 951, 953 (1917); Philippine Autonomy Act § 2. The fact that the two possessions were on different courses was only confirmed in 1934, with the passage of the Philippine Independence Act. As a result, Friend's equal protection argument must fail.

## IV.

Next, the Attorney General argues that, while the district court correctly concluded that section 1993's reference to the United States did not include the Philippines, the district court ultimately erred when it held that the Attorney General could not revoke Friend's certificate of citizenship. The district court had reasoned that the mistake of law resulting in the issuance of the certificate to Friend did not rise to a level of illegality sufficient to permit the certificate's cancellation.

The Attorney General had instituted proceedings to cancel Friend's certificate of citizenship pursuant to her authority under 8 U.S.C. § 1453, which states in relevant part that "[t]he Attorney General is authorized to cancel any certificate of citizenship ... if it shall appear to the Attorney General's satisfaction that such document or record was illegally or fraudulently obtained." 8 U.S.C. § 1453.

Noting that U.S. citizenship is regarded by many "as the highest hope of civilized men," the Supreme Court has stated that, once citizenship has been conferred, it "should not be taken away without the clearest sort of justification and proof." *Schneiderman v. United States,* 320 U.S. 118, 122, 63 S.Ct. 1333, 87 L.Ed. 1796 (1943). The Attorney General must demonstrate the alleged illegality by clear and convincing evidence. *See id.* at 125, 63 S.Ct. 1333. In cases analyzing denaturalization proceedings, the Court has also stated, however, that "there must be strict compliance with all the congressionally imposed prerequisites to the acquisition of citizenship. Failure to comply with any of these conditions renders the certificate of citizenship 'illegally procured,' and naturalization that is unlawfully procured can be set aside." [6] *Fedorenko v. United States,*

---

**6.** Friend's contention that denaturalization cases such as *Fedorenko* should not apply

449 U.S. 490, 506, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981); *see also Lee Hon Lung v. Dulles*, 261 F.2d 719, 723 (9th Cir.1958) ("[A] certificate is 'illegally procured' ... if it is later determined that an essential finding of fact in the naturalization proceeding was erroneous."). This holding is in keeping with the general principle that " '[n]o alien has the slightest right to naturalization unless all statutory requirements are complied with,' " and that Congress has the right "not to grant a United States citizen the right to transmit citizenship by descent." *Rogers*, 401 U.S. at 830, 91 S.Ct. 1060 (quoting *United States v. Ginsberg*, 243 U.S. 472, 475, 37 S.Ct. 422, 61 L.Ed. 853 (1917)).

■ Once the district court held as a matter of law that Friend did not meet one of the strict requirements for citizenship, it did not have the discretion to rule that the error did not qualify as an illegality that would permit revocation of the certificate. *See Lee Hon Lung*, 261 F.2d at 723 (noting that errors allowing the cancellation of citizenship may be errors of law or fact). It does not matter that Friend fully disclosed the basis for his claim of citizenship to the Immigration Examiner, or that one might characterize the mistake as minor or understandable. "Once it has been determined that a person does not qualify for citizenship, ... the district court has no discretion to ignore the defect and grant citizenship." *Immigration & Naturalization Serv. v. Pangilinan*, 486 U.S. 875, 884, 108 S.Ct. 2210, 100 L.Ed.2d 882 (1988) (internal quotation omitted) (alteration in original). The district court therefore erred in holding that the mistake of law resulting in Friend's receipt of a certificate

when considering claims of derivative citizenship is without merit. First, the statutes governing the two proceedings, 8 U.S.C. §§ 1451 and 1453, closely parallel each other. Second, naturalization and derivative grants of citizenship by birth are both conferred by statutes, and are at root both naturalization proceedings. *See Miller v. Albright*, 523 U.S. 420, ——, ——, 118 S.Ct. 1428, 1432, 1446, 140 L.Ed.2d 575 (1998) (plurality opinion);

of citizenship was not sufficiently serious to permit the certificate's revocation.

## V.

The district court held as an alternative basis for its decision that the Attorney General had abused her discretion by instituting proceedings to cancel Friend's certificate of citizenship. The district court based its holding on an opinion of the Attorney General from 1960, which addressed a dispute between the State Department and the INS regarding whether the INS had properly issued a certificate of citizenship. *See* 41 Op. Att'y Gen. 452 (1960). As here, the individual in question, Mr. Flegenheimer, had never committed any wrongful acts in obtaining his certificate, and the error claimed by the State Department involved a mistake of law. *See id.* at 461–62. The Attorney General stated that "[i]t is my belief that no proceeding should be instituted where the equities of the case are appealing, and there is a substantial doubt as to whether legal error was committed in issuing the certificate." *Id.* at 462.

As an initial matter, we do not understand how the Attorney General can be said to have abused her discretion by adopting one of two plausible interpretations of a statute, especially when her interpretation later is held by courts to be the correct one. This is not a situation, as in the Flegenheimer opinion, where the Attorney General had "substantial doubt" as to whether a legal error had been committed.

■ Moreover, the Supreme Court has stated plainly that when one of the strict prerequisites for Congressionally-con-

*Wong Kam Wo v. Dulles*, 236 F.2d 622, 625 (9th Cir.1956) ("Section 1993 is therefore a naturalization law in the constitutional sense."). Third, the applicability of the denaturalization cases is emphasized by the fact that these cases rely on the *Schneiderman* decision, a case that involved the cancellation of a certificate of naturalization, and a case that Friend relies on in the briefs he has submitted to this Court.

ferred citizenship has not been satisfied, a certificate of citizenship has been illegally procured. *See Fedorenko,* 449 U.S. at 506, 101 S.Ct. 737. Administrative regulations state in mandatory language that, "[i]f it shall appear to a district director that a person has illegally or fraudulently obtained or caused to be created a certificate ... described in section 342 of the Act, a notice shall be served upon the person of intention to cancel the certificate...." 8 C.F.R. § 342.1. As a result, once the Attorney General discovered that the certificate of citizenship had been issued in error, she had a duty to institute cancellation proceedings. At the very least, the 1960 opinion of the Attorney General provides absolutely no grounds for finding that the Attorney General's actions in this case were "arbitrary, illegal or irrational." *Casem v. Immigration & Naturalization Serv.,* 8 F.3d 700, 702 (9th Cir.1993). The Attorney General has committed no abuse of discretion.

## VI.

Residence in the Philippines during its territorial period does not qualify as residence "in the United States" under Rev. Stat. § 1993. As a result, Friend's father was not able to transmit his U.S. citizenship to Friend, and Friend received his certificate of citizenship in error. The Attorney General properly responded to this error by instituting proceedings to cancel Friend's certificate of citizenship. The decision of the district court declaring Friend to be a citizen of the United States is therefore REVERSED.