HOWARD, Circuit Judge,
(dissenting).
The inability of American citizens residing in the territories to participate in the election of our nation’s leaders is antithetical to our foundational democratic values. Like Judge Torruella, Judge Leval of the Second Circuit[49] has observed that excluding these United States citizens from voting for President of the United States poses serious “problems of fairness, resentment and impaired reputation in the community of nations.” Romeu v. Cohen, 265 F.3d 118, 128 (2nd Cir.2001)(Leval, J., writing separately).
Constructively, Judge Leval has explained in some detail how legislation could constitutionally provide for participation by Puerto Ricans in Presidential elections. See id. at 128-30; but see id. at 131-36 (Walker, C.J., disputing that Congress has such power, while sharing the concern “that the U.S. citizens residing in the territories are not being afforded a meaningful voice in national governance.”). There is every reason to expect that people of good will serving in our legislative and executive branches would seriously consider Judge Leval’s proposal among other options, were the plaintiffs to successfully prosecute this action. But this is not to endorse any particular implementation of voting rights — the preferences of the people of Puerto Rico are of paramount consideration. It is instead to acknowledge that there could be approaches beyond what many have assumed.
More generally, while it may be that the Constitution does not itself confer voting rights upon citizens, generations of Americans have rightly taken as an article of faith their ability to participate in the selection of our national leaders through the franchise.[50] In seeking to participate in the Presidential election, the plaintiffs attempt to assert a right long held by law abiding United States citizens of age, whether at home or abroad, so long as they are not residents of one of the territories. Because the interest represented by the plaintiffs’ claim is of paramount importance to our democratic structure, we ought to approach their claim searchingly rather than skeptically,[51] with the under *185 standing that the court’s declaratory authority should be exercised to its outermost limits if the claim is otherwise viable. We should take care that the claims of American citizens who assert a basic right to participate in the democratic process do not suffer stillbirth through exacting application of redressability doctrines that, as Judge Torruella has pointed out, have significant flexibility.
Turning directly to the plaintiffs’ treaty claim, even if there were a persuasive argument not to accept Judge Torruella’s reasoning, the case still should not end at this stage. This is because plaintiffs’ claim under the ICCPR should not be resolved on a motion under Fed.R.Civ.P. 12(b)(6) without an opportunity for record development.[52]
The United States signed the ICCPR in 1977. Among its provisions, Article 25 provides:
Every citizen shall have the right and opportunity and without unreasonable restrictions to take part in the conduct of public affairs, directly or through freely chosen representatives and to vote and to be elected at genuine periodic elections which shall be by universal and equal suffrage and shall be held by secret ballot, guaranteeing the free expression of the will of the electors.
999 U.N.T.S. 171 (opened for signature Dec. 19, 1966). The Senate did not provide its advice and consent for the ICCPR until 1992. In consenting to the Treaty, the Senate added a declaration stating that the ICCPR will be “non-self-executing,”[53] as requested by the executive. S. Exec. Rep. No. 102-23 at 23 (1992) (“[T]he United States declares that the provisions of Articles 1 through 27 of the Covenant are not self-executing.”).[54] From this declaration, one might conclude that the plaintiffs do not have enforceable rights under Article 25 of the Treaty.[55] But in my view, separation of powers considerations prevent a court from relying exclusively on the Senate’s declaration to determine that *186 a treaty is non-self-executing. The Supremacy Clause and Article III require a court to examine independently the intentions of the treatymakers to decide if a treaty, by its own force, creates individually enforceable rights. While the Senate’s preratification view on the matter is entitled to some weight, other facts, including extrinsic evidence concerning the Treaty’s negotiation history and international practice under the Treaty, are relevant. Because the procedural posture of this case has precluded introduction of evidence regarding the ICCPR’s negotiation and enforcement history, it is premature to dismiss on the ground that the Treaty does not provide the plaintiffs with enforceable rights.
The Senate’s practice of declaring certain treaties to be non-self-executing is of relatively recent origin.[56] See L. Henkin, Foreign Affairs and the United States Constitution, 201-02 (2d ed.1996). This practice has become commonplace especially, although not exclusively, for human rights treaties, see L. Damrosch, The Role of the United States Senate Concerning “Self-Executing” and “Non-Self-Executing” Treaties, 67 Chi-Kent L.Rev. 515, 519-26 (1991), and has been accepted in some quarters, see Restatement (Third) of Foreign Relations Law of the United States § 303, cmt. d (1986) (stating that there is no accepted doctrine indicating limits on the conditions that the Senate may impose on its provision of consent), but “without significant discussion,” Henkin, Foreign Affairs, supra at 202.
Unlike in some other countries, treaties become part of the fabric of our domestic law upon ratification. Carlos Manuel Vázquez, Treaty-Based Rights and Remedies of Individuals, 92 Colum. L.Rev. 1082, 1111 (1992) (describing the rule under British law that a treaty does not have domestic effect until Parliament passes implementing legislation). This is a direct result of the Supremacy Clause, which makes treaties part of the “supreme law of the land” along with federal statutes, federal common law, and the Constitution itself. U.S. Const, art. VI., cl. 2.[57] The Constitution’s grant of power to the federal judiciary also recognizes that treaties constitute domestic law. Under article III, § 2, cl. 1, the federal judicial power “extend[s] to all Cases, in Law and Equity arising under ... Treaties.” The express language of the Constitution thus provides that a treaty ratified by the President, after the Senate’s advice and consent, see U.S. Const, art. II, § 2, cl. 2, is part of our domestic law and may be enforced in a domestic court.
*187 This is not a historical accident, for incorporating treaties into the domestic law was one of the purposes for drafting the Constitution. Under the Articles of Confederation, the States were reluctant to enforce treaties entered into by the national government. In proposing the Virginia Plan as the working draft for the new Constitution, Edmund Randolph complained about the Articles’ powerlessness to “cause infractions of treaties ... to be punished.” 1 M. Farrand, The Records of the Federal Convention of 1787 19 (rev. ed.1996). James Madison shared this view. He claimed that “experience [under the Articles] had evidenced a constant tendency in the States to ... violate national Treaties. Id. at 164. The Constitution sought to remedy this tendency by making treaties “the supreme law of the land.”
The Framers’ intention to establish treaties as law, without further legislative action, is demonstrated by several of the proposals that the Constitutional Convention rejected. One such proposal would have required that treaties be sanctioned by legislation if they were to have “the operation of laws.” J. Madison, Notes of Debates in the Federal Convention of 1787 520 (1966 ed.). Another would have established two types of treaties: one requiring only action by the President and the Senate, and a second requiring additional action by the House of Representatives. See 2 Farrand, supra at 394. The rejection of these proposals illustrates the Framers’ intention that all treaties constitute law under the Supremacy Clause.[58] As James Wilson stated: “[The Supremacy Clause] will show the world that we make the faith of treaties a constitutional part of the character of the United States; that we secure [their] performance no longer nominally, for the judges of the United States will be enabled to carry [them] into effect.” 2 J. Elliot, The Debates in the Several State Conventions on the Adoption of the Federal Constitution 490 (2d ed. 1881).
The expectation that treaties would become operative as domestic law upon ratification is also expressed in the Federalist Papers and the ratification debates within the States. For example, in Federalist No. 22, Alexander Hamilton explained that “the treaties of the United States, to have any force at all, must be considered as part of the law of the land. Their true import, as far as respects individuals, must, like all other laws, be ascertained by judicial determinations.” The Federalist No.22 at 150 (C. Rossiter ed.1961). Similarly, at the North Carolina ratifying convention, one of the Constitution’s supporters explained:
It was necessary that treaties should operate as laws on individuals. They ought to be binding upon us the moment they are made. They involve in their nature not only our own rights, but those of foreigners and should be protected by the federal judiciary.
4 Elliot, supra at 158. Even those opposing ratification shared in this view. “Brutus,” in criticizing Article III, stated that he could “readily comprehend what is meant by deciding a case under a treaty. For as treaties will be the law of the land, every person who has rights or privileges secured by a treaty, will have the aid of courts in recovering them.” 16 J. Kamin-ski and G. Saladino, The Documentary History of the Ratification of the Constitution 172 (1984).
*188 One commentator has summarized the founding period evidence as follows:
[The] historic patterns of expectation demonstrate that most Framers intended all treaties immediately to become binding on the whole nation, superadded to the laws of the land; to be observed by every member of the nation, to be applied by the courts whenever a cause of action arose from or touched upon them; and to prevail over and preempt any existing state action. In these ways, at least, all treaties (to the extent of their grants, guarantees, or obligations) were to be self-executing.
See J. Paust, Self-Executing Treaties, 82 Am. J. Int’l L. 760, 764 (1988).[59]
This understanding quickly found its way into the United States Reports. See Ware v. Hylton, 3 U.S. (3 Dall.) 199, 1 L.Ed. 568 (1796). Ware concerned the 1783 Peace Treaty with Great Britain. The plaintiff, a British citizen, claimed that he was owed a debt by a Virginia citizen. See id. at 199-201. The defendant claimed that the debt had been extinguished by a 1777 Virginia statute. See id. The treaty provided, however, that “creditors, on either side, shall meet with no lawful impediment to the recovery of full value of all bona fide debts heretofore contracted.” Id. at 277. The British plaintiff argued that this treaty provision overrode the Virginia statute and reinstated the debt. See id. at 209.
Justice Iredell, sitting as a circuit judge, considered whether the treaty was operative without the passage of any additional domestic legislation. He recognized that, under the law of Great Britain, a treaty would not be operative domestically without implementing legislation, but that the purpose of the Supremacy Clause was to differentiate the effect of treaties under American law:
Under this constitution, therefore, so far as a treaty constitutionally is binding, upon principles of moral obligation, it is also, by the vigor of its own authority, to be executed in fact. It would not otherwise be the supreme law, in the new sense provided for, and it was so before, in a moral sense.... [Wjhen the constitution was ratified, the case as to the treaty in question stood upon the same footing, as if every act constituting an impediment to a creditor’s recovery had been expressly repealed, and any further act passed, which the public obligation had before required, if a repeal alone would not have been sufficient.

Id.

The case went to the Supreme Court, where each Justice wrote his own opinion. No Justice disagreed with Justice Iredell’s explanation of the domestic effect of the treaty. See id. at 237 (“[E]very treaty made by authority of the United States, shall be superior to the constitution and laws of any individual state....”) (Chase, J.). Ware thus supports the view that, when a treaty creates obligations favoring an individual, the individual may enforce the obligation directly in a United States court, even though there is no implementing legislation.[60] In other words, under American law, treaties can be self-executing. See Head Money Cases, 112 U.S. 580, *189 598-99, 5 S.Ct. 247, 28 L.Ed. 798 (1884) (“A treaty ... is a law of the land as .an act of Congress is, whenever its provisions prescribe a rule by which the rights of the private citizen ... may be determined. And when such rights are of a nature to be enforced in a court of justice, that court resorts to the treaty for a rule of decision for the case before it as it would to a statute.”).
The suggestion that some treaties are not self-executing first appeared in Foster v. Neilson, 27 U.S. (2 Pet.) 253, 7 L.Ed. 415 (1829), overruled in part by United States v. Percheman, 32 U.S. 51, 7 Pet. 51, 8 L.Ed. 604 (1833) (reinterpreting treaty in light of new evidence regarding meaning of ambiguous term). There, a treaty with Spain, designed to protect privat.er land grants, provided that “grants shall be ratified and confirmed.” Id. at 309. Writing for the Court, Chief Justice Marshall concluded that the treaty was not self-executing because, by its terms, it did not establish a right in an individual but rather placed an obligation on the legislative branch to act. See id. at 314. As Chief Justice Marshall explained:
Our constitution declares a treaty to be the law of the land. It is consequently to be regarded in courts of justice as equivalent to an act of the legislature, whenever it operates of itself, without the aid of any legislative provision. But when the terms of the stipulation import a contract, where either of the parties engages to perform a particular act, the treaty addresses itself to the political, not the judicial department; and the legislature must execute the contract before it can be become a rule for the court.

Id.

The Foster rule — that certain treaties are non-self-executing — is a judicially-created doctrine. See Henkin, The Ghost of Senator Bricker, supra at 347. Under this doctrine, a court must ascertain whether the instrument was intended by its makers to establish directly enforceable rights, or only to impose an obligation on one of the political branches. See Frolova v. Union of Soviet Socialist Republics, 761 F.2d 370, 373 (7th Cir.1985) (“Whether a treaty is self-executing is an issue for judicial interpretation.”); Restatement supra at § 111, cmt. h (‘Whether an agreement is to be given effect without further legislation is an issue that a court must decide when a party seeks to invoke the agreement as law.”). Such an intent is to be gleaned from the treaty’s terms and history. See Diggs v. Richardson, 555 F.2d 848, 851 (D.C.Cir.1976) (stating that, “[i]n determining whether a treaty is self-executing courts look to the intent of the signatory parties as manifested by the language of the instrument, and if the instrument is uncertain, recourse must be had to the circumstances surrounding its execution”).
' Given this constitutional and judicial history, a court ought not quickly conclude that treaties are non-self-executing. Cf. United States v. Li, 206 F.3d 56, 61 (1st Cir.2000) (en banc) (stating that there is a presumption against self-executing treaties under American law).[61] Rather, a court must conduct an independent and searching inquiry into the treaty’s purpose. And on this point a declaration by the Senate that a treaty is non-self-executing should not be dispositive.
Those holding a contrary view tend to regard the Senate’s power to declare a treaty non-self-executing to be an adjunct of its general power to consent to ratification. See Restatement supra at § 303, cmt. d. There is no doubt that the Senate *190 may hinge its consent to ratify a treaty on a reservation. See Haver v. Yaker, 76 U.S. (9 Wall.) 32, 35, 19 L.Ed. 571 (1869). But a reservation is a “unilateral statement ... whereby [one party] purports to exclude or to modify the legal effect of certain provisions of the treaty in the application to that State.” Vienna Convention on the Law of Treaties, art. 2(l)(d) (1969). A reservation thus has an actual effect on the terms of the treaty. See M. Glennon, The Constitutional Power of the United States Senate to Condition Its Consent to Treaties, 67 Chi.-Kent. L.Rev. 533, 542 n. 63 (1991) (citing authority). And the reservation will vitiate the Senate’s consent if its terms are not incorporated into the treaty. See Henkin, Foreign Affairs, supra at 180-81.
A non-self-execution declaration differs materially from a reservation. See Restatement, supra at § 314, cmt. d. The declaration is not presented to the other international signatories as a request for a modification of the treaty’s terms. Rather, it is directed primarily toward United States courts to express “the sense of the Senate” that the treaty should not be interpreted to establish individually enforceable rights. As two leading commentators have explained, the Senate does not have the power to bind a court to such declarations:
[T]he Senate lacks the constitutional authority to declare the non-self-executing character of a treaty with binding effect on U.S. courts. The Senate has the unicameral power only to consent to ratification of treaties, not to pass domestic legislation. A declaration is not part of a treaty in the sense of modifying the legal obligations created by it. A declaration is merely an expression of an interpretation or of a policy or position. U.S. courts are bound by the Constitution to apply treaties as the law of the land. They are not bound to apply expressions of opinion adopted by the Senate (and concurred in by the President). The courts must undertake their own examination of the terms and context of each provision in a treaty to which the United States is a party and decide whether it is self-executing. The treaty is law. The Senate’s declaration is not law. The Senate does not have the power to make law outside the treaty instrument.
S. Riesenfeld & F. Abbott, Foreword: Symposium of Parliamentary Participation in the Making and Operation of Treaties, 67 Chi.-Kent L.Rev. 293, 296-97 (1991).[62]
Stated differently, the Senate’s power under Article II extends only to the making of reservations that require changes to a treaty before the Senate’s consent will be efficacious. A declaration that only has domestic effect is, in reality, an attempt to legislate concerning the internal implementation of a treaty. But the power to legislate is not granted to the Senate under Article II. Legislation may only be enacted through bicameral adoption and presentation to the President as set forth *191 in Article I. See INS v. Chadha, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983).
The only case that I am aware of that addresses a similar question supports this view. In Power Authority of New York v. Federal Power Commission, 247 F.2d 538 (D.C.Cir.), vacated and remanded with instructions to dismiss as moot 355 U.S. 64, 78 S.Ct. 141, 2 L.Ed.2d 107 (1957), the United States entered a bilateral treaty with Canada concerning the use of the Niagara River to produce power along the United States/Canada border. See id. at 539. In its resolution consenting to the treaty, the Senate included a reservation whereby the United States reserved the right to redevelop its portion of the power generated on the river only through an act of Congress. See id. The United States and Canada agreed that the reservation only concerned American domestic law and did not require any changes to the treaty. See id. at 540-41.
The Power Authority of the State of New York sought a license from the Federal Power Commission to use the Niagara River for the state’s anticipated power project. See id. at 539. The Commission dismissed the authority’s license application, contending that the Senate’s reservation precluded it from granting such a license because federal legislation was required. See id. at 539-40.
The D.C. Circuit held that the reservation was ineffective because it involved only United States domestic law. For the reservation to be binding on the judiciary, the court reasoned, it had to constitute an actual part of the treaty:
A true reservation which becomes a part of a treaty is one which alters the effect of the treaty insofar as it may apply in the relations of the State with the other State or States which may be parties to the treaty. It creates a different relationship between the parties and varies the obligations of the parties proposing it.
Id. at 541. Because the reservation was merely an expression of the Senate’s view of domestic policy it had no domestic effect. See id.[63]
The non-self-execution declaration in the ICCPR is a similar expression of the Senate’s desire concerning a purely domestic issue. Like the reservation in Power Authority, the declaration was not intended to modify the Treaty terms in any way. Thus, it lacks binding force. Cf. Fourteen Diamond Rings v. United States, 183 U.S. 176, 178-80, 22 S.Ct. 59, 46 L.Ed. 138 (holding that a Senate resolution purporting to interpret a treaty adopted after ratification was not binding). Of course, the Senate’s view is relevant. Cf. United States v. Stuart, 489 U.S. 353, 366-67, 109 S.Ct. 1183, 103 L.Ed.2d 388 (1989) (stating *192 that Senate preratification debate is relevant to determining the meaning of a treaty). But, in the end, whether there is a private right of action under the ICCPR should be decided on the basis of the totality of available evidence. See Volkswagenwerk v. Schlunk, 486 U.S. 694, 700, 108 S.Ct. 2104, 100 L.Ed.2d 722 (1988) (“Treaties are construed more liberally than private agreements, and to ascertain their meaning we may look beyond the written words to the history of the treaty negotiations, and the practical construction adopted by the parties.”); see also Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa, 482 U.S. 522, 534, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987) (stating that treaty interpretation begins with the text of the treaty, but that the treaty’s history and practical construction adopted by the parties are relevant); Air France v. Saks, 470 U.S. 392, 400, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985) (stating that “in interpreting a treaty it is proper ... to refer to the records of its drafting and negotiation”); Islamic Rep. of Iran v. Boeing Co., 771 F.2d 1279, 1283 (9th Cir.1985) (explaining that the most important factor in determining whether a treaty is self-executing is the language, purpose, and intent behind the treaty).
Given the broad judicial inquiry required to determine if a treaty establishes individually enforceable rights and the non-binding nature of the Senate’s non-self-execution declaration, I do not think it proper to affirm the dismissal under Fed.R.Civ.P. 12(b)(6). See Paust, Avoiding “Fraudulent” Executive Policy, supra at 1259-62 (suggesting that text of ICCPR indicates that it was intended to be self-executing). We do not have before us sufficient information concerning the negotiation history of the ICCPR or the way in which the other signatories have enforced it. Without such information, we lack the full spectrum of sources necessary to evaluate the extent to which, if at all, the plaintiffs may possess one or more enforceable rights under the Treaty.
A “court should be especially reluctant to dismiss on the basis of the pleadings when the asserted theory of liability is novel or extreme, since it is important that new legal theories be explored and assayed in the light of the actual facts rather than a pleader’s suppositions.” 5A Wright & Miller, Federal Practice & Procedure, § 1357; see also Doe v. Walker, 193 F.3d 42, 46 (1st Cir.1999)(“Our preference for a better record is well supported and ... is one which we are entitled to require for reasons of prudence.”). When looked at the way I see it, this suit presents a novel claim concerning the right to vote — a right which, as I have said, has special significance. See Wesberry v. Sanders, 376 U.S. 1, 17, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964) (stating that “no right is more precious in a free country than that of having a voice in the election of those who make the laws, under which, as good citizens, we must live”). Given the sensitive nature of the dispute and its implications, I would permit the parties to develop a record concerning the ICCPR.[64]

. Now Senior Circuit Judge.

. "[T]he right to vote, as the citizen’s link to his laws and government, is protective of all fundamental rights and privileges.” Evans v. Comman, 398 U.S. 419, 422, 90 S.Ct. 1752, 26 L.Ed.2d 370 (1970). ”[M]ost U.S. citizens have a limited, constitutionally enforceable right to vote in presidential elections as those elections are currently configured. The States have uniformly exercised their Article II authority by delegating the power to appoint presidential (and vice-presidential) electors to U.S. citizens residing in the State to be exercised in democratic elections.” Romeu, 265 F.3d at 123.

. "Since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized.” Reynolds v. Sims, 377 U.S. 533, 562, 84 S.Ct. 1362, 12 L.Ed.2d 506 *185 (1964); see also Kramer v. Union Free School District, 395 U.S. 621, 626, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969) ("[C]areful examination is necessary because statutes distributing the franchise constitute the foundation of our representative society. Any unjustified discrimination in determining who may participate in political affairs or in the selection of public officials undermines the legitimacy of representative government.").

. Beyond my own views expressed here, I agree with much of Judge Torruella's dissent. In particular, I agree substantially with his reasoning in Parts I., II. B. 1., and II. C. 1. and join him in those respects.

. Courts and commentators have used the term ‘'non-self-executing” to mean many things. See D. Cinotti, Note, The New Isolationism: Non-Self-Execution Declarations and Treaties as the Supreme Law of the Land, 91 Geo. L.Rev. 1277, 1279 (2003). For purposes of this opinion, I understand the term to mean that a treaty does not create individually enforceable rights without the passage of implementing legislation. See Columbia Marine Servs., Inc. v. Reffet Ltd., 861 F.2d 18, 21 (2d Cir.1988) (stating that in order for an action to arise under a treaty for purposes of 28 U.S.C. § 1331, "the treaty must be self-executing, i.e., it must prescribe rules by which private rights may be determined”); J. Paust, Avoiding "Fraudulent” Executive Policy: Analysis of the Covenant on Civil and Political Rights, 42 De Paul L.Rev. 1257, 1258 n.4 (1992) (explaining that the purpose of the non-self-execution declaration in the ICCPR was intended to assure that the Treaty would not create a private cause of action in U.S. courts).

. Articles 1 through 27 are the rights-granting provisions of the ICCPR.

. It might also be said that as a prudential matter the Senate’s declaration precludes relief under the Declaratory Judgment Act. For the reasons expressed herein, I would not decide this prudential question at the motion to dismiss stage.

. This practice appears to be, at least in part, a response to the proposed Bricker Amendment, which would have amended the Constitution to require implementing legislation before a treaty could have domestic effect. See S.J. Res. 130, printed at 98 Cong. Rec. 907-08 (1952). Some scholars have concluded that the Senate viewed non-self-executing declarations as a way to achieve the objectives of the Bricker Amendment without having to amend the Constitution. See L. Henkin, U.S. Ratification of Human Rights Conventions: The Ghost of Senator Bricker, 89 Am. J. Int’l L. 341, 348-50 (1995). See also D. Sloss, The Domestication of Int'l Human Rights: Non-Self-Executing Declarations and Human Rights Treaties, 24 Yale J. Int'l L. 129, 173 (1999).

. The Supremacy Clause states:
This Constitution, and the Laws of the United States made in Pursuance Thereof; and all which shall be made in Pursuance Thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme law of the land; and the judges in every State shall be bound thereby, any Thing in the Constitution of Laws of any State to the Contrary notwithstanding. (Emphasis supplied).

. In a similar vein, the Committee on Style removed from the final version of the Supremacy Clause language that would have given the national government the power to “enforce treaties.” The Committee removed this language because it was redundant; the Supremacy Clause already declared that treaties were law. See Farrand, supra, at 389-90.

. For a fuller discussion, see Paust, supra; Vázquez, supra; and M. Flaherty, History Right?: Historical Scholarship, Original Understanding, and Treaties as “Supreme Law of the Land", 99 Colum. L.Rev.2095 (1999). For an alternate interpretation of the Founding period, see J. Yoo, Globalism and the Constitution: Treaties, Non-Self-Execution, and the Original Understanding, 99 Colum.L.Rev.1955 (1999).

. In another early case, Chief Justice Marshall echoed this sentiment. Owings v. Norwood’s Lessee, 9 U.S. (5 Cranch) 344, 348-49, 3 L.Ed. 120 (1809) (“Whenever a right grows out of, or is protected by a treaty, it is to be protected.”).

. Judge Torruella took a similar view in his dissent in Li. See 206 F.3d at 70-71.

. Other commentators, including Professor Henkin, share this view. See Henkin, Foreign Affairs, supra at 202 (describing the Senate's practice of declaring treaties as non-self executing to be "anti-Constitutional in spirit and highly problematic as a matter of law''); Hen-kin, The Ghost of Senator Bricker, supra at 346 (stating that non-self-execution declarations by the Senate "may be unconstitutional”). See also D. Cinnoti, supra; J. Quigley, The Rule of Non-Inquiry and Human Rights Treaties, 45 Cath. L.Rev. 1213 (1995); J. Quigley, The Int’l Covenant on Civil and Political Rights and the Supremacy Clause, 42 De Paul L.Rev. 1287 (1993); Paust, Avoiding Fraudulent Executive Policy, supra; C. Dearborn, Note, The Domestic Legal Effect of Declarations that Treaty Provisions Are Not-Self-Executing, 57 Tex. L.Rev. 233 (1979).

. Sosa v. Alvarez-Machain, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004) is not to the contrary. That case involved whether the right to be free from arbitrary abduction and detention was protected under customary international law. The plaintiff in Sosa did not sue directly under the ICCPR but rather argued that the Treaty's terms helped establish the relevant principle of customary international law for purposes of his Alien Tort Act claim. The Court relied on the Senate’s non-self-execution declaration in the ICCPR as one factor to support its conclusion that the ICCPR could not, by itself, establish a rule of customary international law. See id. at 2763 & 2767. But the Court was not faced with (and did not decide) whether the Senate's declaration ipso facto prevents a plaintiff from suing directly under the Treaty. Because the question in Sosa was not the binding effect of the Senate's non-self-execution declaration in determining whether the ICCPR establishes a private cause of action, the parties did not present the Court with (and it did not address) the separation of powers arguments questioning the Senate's authority to issue such declarations. See, e.g., Reply Brief of United States at 8, Sosa, supra.

. I am less sanguine about whether plaintiffs may successfully press a claim under customary international law. The most promising avenue for challenging Puerto Rico’s status as violative of a customary international norm— a claim arguing that customary international law recognizes a right of peoples to self-determination and imposes on nations an obligation to decolonize — more properly belongs not to an individual Puerto Rican, but to the *193 Commonwealth of Puerto Rico itself, the political leadership of which is elected by individual Puerto Ricans and, presumably, would be responsive to the electorate. See, e.g., Duke Power Co. v. Carolina Env. Study Group, Inc., 438 U.S. 59, 80, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); Laurence H. Tribe, American Constitutional Law, § 3-19 (3d ed.2000); Erwin Chemerinsky, Constitutional Law Principles and Policies, § 2.5.4 (2d ed.2002). In such a lawsuit, there would be less reason for concern that the plaintiffs might be seeking a fundamental change in the relationship between the Commonwealth and the United States that many of their fellow Puerto Ricans may not desire.